## UNITED STATES *v.* HOWARD, TRADING AS STOKES FISH CO.

No. 52. Argued December 6, 1956.—Decided January 14, 1957.

*Leonard B. Sand* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Olney, Beatrice Rosenberg* and *Joseph A. Barry.*

*Clarence L. Thacker* argued the cause and filed a brief for appellee.

Mr. Justice Reed delivered the opinion of the Court.

A federal criminal information was filed by the United States against Ludenia Howard, trading as Stokes Fish Company, appellee, in the United States District Court for the Southern District of Florida, charging her with a violation of the Federal Black Bass Act of May 20, 1926, as amended, c. 346, 44 Stat. 576, 46 Stat. 845, 61 Stat. 517, 66 Stat. 736, 16 U. S. C. §§ 851–854. The Act provides:

> "It shall be unlawful for any person to deliver . . . for transportation . . . from any State . . . any black bass or other fish, if (1) such transportation is contrary to the law of the State . . . from which such . . . fish . . . is to be transported . . . ." 16 U. S. C. § 852.

The information stated that appellee delivered fish for transportation across the Florida border contrary to the "laws of the State of Florida." The relevant fishing provisions consisted of the rules and regulations of the Florida Game and Fresh Water Fish Commission and a criminal penalty imposed by the legislature for violation of the rules. The District Court, however, held that the rules and regulations do not constitute the "law of" Florida within the meaning of the Black Bass Act and on appellee's motion quashed the information. An appeal was brought here by the United States pursuant to 18 U. S. C. § 3731. We noted probable jurisdiction. 351 U. S. 980.

Florida's Game Commission was created by a 1942 constitutional amendment (Art. IV, § 30, Constitution of Florida) which provides that:

> "after January 1, 1943, the management, restoration, conservation, and regulation, of the . . . fresh-water fish, of the State of Florida . . . shall be vested in [the] Commission . . . ."

It was empowered by the same amendment

> "to fix bag limits and to fix open and closed seasons, on a state-wide, regional or local basis, as it may find to be appropriate, and to regulate the manner and method of taking, transporting, storing and using . . . fresh-water fish . . . ."

The amendment further provides:

> "The Legislature may enact any laws in aid of . . . the provisions of this amendment . . . . All laws fixing penalties for the violation of the provisions of this amendment . . . shall be enacted by the legislature from time to time."

Pursuant to this amendment, the Florida Legislature authorized the Commission to exercise

> "the powers, duties and authority granted by § 30, article IV, of the constitution of Florida, by the adoption of rules, regulations and orders . . . ." Fla. Stat. Ann., 1943, § 372.021.

Another statute makes it a misdemeanor to violate

> "any rule, regulation or order of the game and fresh water fish commission . . . ." Fla. Stat., 1955, § 372.83.

Rule 14.01 of the Commission's rules prohibits the transportation of certain fresh fish outside the State; it is this regulation that Ludenia Howard is accused of breaking.[1] Because the information was quashed for failure to state a federal crime, we assume the alleged acts of appellee

---

[1] "No person . . . shall . . . transport, transport for sale, or transport out of the State of Florida any large or small mouth black bass, speckled perch, jack, shell cracker, warmouth perch, red breast, pike, stump knocker, sun fish, or Canadian sunfish, or any other species of bream; . . . ."

occurred and that she is subject to criminal prosecution in Florida pursuant to § 372.83 of the Florida Statutes, as set out above.

The sole question presented is whether Rule 14.01 of the Commission's regulations, as enforced by § 372.83 of the Florida Statutes, is a "law" of the State of Florida as that term is used in the Federal Act.

This Court has repeatedly ruled, in other circumstances, that orders of state administrative agencies are the law of the State. In *Grand Trunk R. Co.* v. *Indiana R. Comm'n,* 221 U. S. 400, 403, the Court stated, citing *Prentis* v. *Atlantic Coast Line Co.,* 211 U. S. 210, 226:

> "the order [of the Indiana Railroad Commission] . . . is a law of the State within the meaning of the contract clause of the Constitution . . . ."

And, in *Lake Erie & W. R. Co.* v. *Public Utilities Comm'n,* 249 U. S. 422, 424, it was said that an order of the state public utilities commission "being legislative in its nature . . . is a state law within the meaning of the Constitution of the United States and the laws of Congress regulating our jurisdiction." A similar statement may be found in *Arkadelphia Co.* v. *St. Louis S. W. R. Co.,* 249 U. S. 134, 141.

It was suggested that the action of the court below is supported by *United States* v. *Eaton,* 144 U. S. 677. We believe the case is inapposite. It involved the regulation of manufacturers and dealers in oleomargarine under 24 Stat. 209. Section 18 of the Act provided a criminal penalty for the knowing or willful failure "to do, or cause to be done, any of the things required by law." Section 5 required manufacturers to keep certain records. A similar requirement was imposed upon wholesalers by a regulation made by the Commissioner of Internal Revenue pursuant to § 20. The defendant in the *Eaton* case, a

wholesaler, failed to keep the proper records, but this Court held he had not committed a crime under § 18:

"Regulations prescribed by the President and by the heads of departments, under authority granted by Congress, may be regulations prescribed by law, so as lawfully to support acts done under them and in accordance with them, and may thus have, in a proper sense, the force of law; but it does not follow that a thing required by them is a thing so required by law as to make the neglect to do the thing a criminal offence in a citizen, where a statute does not distinctly make the neglect in question a criminal offence." *Id.,* at 688.

The Court made particular mention of the fact that the Act expressly required manufacturers to keep certain books, but made no such requirement of wholesalers. *Id.*[2] In *Singer* v. *United States,* 323 U. S. 338, 345, we said:

"*United States* v. *Eaton* turned on its special facts, as *United States* v. *Grimaud,* 220 U. S. 506, 518–519, emphasizes. It has not been construed to state a fixed principle that a regulation can never be a 'law' for purposes of criminal prosecutions. It may or may not be, depending on the structure of the particular statute."

See also *Caha* v. *United States,* 152 U. S. 211, 219. Here, it is beyond question that the Florida Legislature, in Fla. Stat., § 372.83, intended to and did make infraction

---

[2] The Court also paid special note to the fact that subsequent to the alleged acts of Eaton, but prior to its decision, Congress amended the Oleomargarine Act to expressly require the keeping of books by wholesalers. 144 U. S., at 685–686, 688. The Court noted this factor in *Eaton* when discussing the *Eaton* case in *Caha* v. *United States,* 152 U. S. 211, 220.

of any commission regulation a violation of state law, punishable as a misdemeanor.

Appellee argues that the rules of the Florida Commission are so subject to change that they lack sufficient substance and permanence to be the "law" of Florida. We need not decide now whether a state agency could make a rule of such a temporary nature and so unaccompanied by the procedural niceties of rule making that the declaration should not be considered the law of the State for purposes of a statute such as the Black Bass Act. These considerations formed no part of the opinion below. Moreover appellee has not demonstrated that the rule here involved is of such a character.

Commission promulgation of orders is regulated by § 372.021 of 14 Fla. Stat. Ann., a legislative enactment. It provides that no regulation or amendment to a regulation is effective until 30 days after the filing of a certified copy of such provisions with the secretary of state. The statute also directs that any change in the type of regulation involved here is to be filed in the office of each county judge and that changes must be published in each county in a newspaper of general circulation.[3] We are advised by the Government's brief that the Commission compiles its rules in a code book which is circulated without cost to all county judges, as is directed by statute, and also to principal sporting goods and license dealers. In fact they seem to be available to anyone requesting them from the Commission. We are also told that it is the Commission's practice to conduct public hearings to give

---

[3] Most fishermen must secure a fishing license (they may be obtained at the office of any county judge) and a statute provides that the "license shall contain on the back thereof a synopsis of the . . . fresh water fishing laws of the state." Fla. Stat., 1955, § 372.69. Whether the rule here involved is printed on appellee's license, indeed, whether appellee even has a license, is not shown by the record at this stage of the proceedings.

everyone an opportunity to air his own views on proposed changes in the rules. None of these assertions is challenged by appellee.

We recognize that not all the above-described procedures are mandatory and that whether any of them was employed with the enactment of Rule 14.01 cannot be ascertained from the record at this time. However, the fact that it is the asserted practice of the Commission to comply with them suggests a potent answer to appellee's charge of impermanence. Moreover, it is not inappropriate for us to note that transportation of some species of fish covered by this information has been prohibited in Florida since 1927. Fla. Stat. Ann., 1943, § 372.29, Florida Laws, 1929, c. 13644, § 35.

The State of Florida prefers to entrust the regulation of its wild life conservation program to a Game Commission. Such a preference is in accordance with the practice of 28 States that have vested full regulatory authority in commissions. Only 6 States reserve that full authority to their legislatures. Sport Fishing Institute Bulletin, No. 26, p. 60 (January 1954). Moreover, a document prepared by the Department of the Interior and submitted to us by the Government at our request shows that even in 1926, the year the Black Bass Act was first passed, significant rule-making power was entrusted to game commissions or commissioners in some 20 States.[4]

That the congressional purpose was to extend the enforcement guarantees of the Black Bass Act to these regulations is the most reasonable interpretation of the Act and is an interpretation supported by the legislative history of the 1947 amendment to the Act. The amend-

---

[4] See, e. g., Supplement to the Codes and General Laws of California, 1925–1927, Act of May 23, 1925, § 3 (Act 2895); Laws of Maine, 1917, c. 219, § 2; New York Laws, 1912, c. 318.

ment, which made the provisions of the Act applicable to all game fish, was accompanied by Senate and House reports containing the following language:

> "The bill is intended to supplement State laws applying to protection of game fish. . . . State laws become ineffectual when fish taken in violation of the law cross the State line. If we are to protect game fish, an important natural resource, the Federal Government must collaborate in the enforcement of protective laws and regulations at the point where State jurisdiction ends." S. Rep. No. 288, 80th Cong., 1st Sess. 2; H. R. Rep. No. 986, 80th Cong., 1st Sess.

Accordingly we hold that the phrase "law of the State," as used in this Act, is sufficiently broad to encompass the type of regulation used in Florida.

*Reversed and remanded.*