**Gary Robert ISKE, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 9801.**

United States Court of Appeals
Tenth Circuit.

June 6, 1968.

Donald P. MacDonald, Boulder, Colo., for appellant.

Donald E. Cordova, Asst. U. S. Atty., Denver, Colo. (Lawrence M. Henry, U. S. Atty., Denver, Colo., with him on the brief), for appellee.

Before LEWIS, SETH and HICKEY, Circuit Judges.

HICKEY, Circuit Judge.

The appellant was informed against pursuant to Fed.R.Crim.P. 7. The information charged that appellant unlawfully sold and delivered LSD (d-lysergic acid diethylamide), a "depressant or stimulant drug" within the meaning of 21 U.S.C. § 321(v) (3),[1] in violation of 21 U.S.C. § 331(q) (2). Appellant moved to dismiss the information on the ground that the statutes, the rules, and the regulations which make the unauthorized delivery of LSD a criminal act are unconstitutional. The trial court overruled the motion and denied the contention by an order in which it found 21 U.S.C. § 321(v) (3) to be a lawful delegation of legislative power providing

---

1. 21 U.S.C. § 321(v) (3) defines "depressant or stimulant drug" as "any drug which contains any quantity of a substance which the Secretary, after investigation, has found to have, and by regulation designates as having, a *potential for abuse* because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect * * *." (emphasis added).

a sufficiently clear and definite standard to satisfy the constitutional requirements regarding the delegation to administrative bodies of the power to make regulations. The court also found sufficient scientific data available to establish a rational relationship between LSD and the object of 21 U.S.C. §§ 321(v) (3), 331(q) (2).[2] Appellant then entered a plea of guilty and was sentenced pursuant to the judgment of the court. Notice of appeal was timely filed, execution of sentence was stayed, and appellant is now on a personal recognizance bond pending the further disposition herein.

"The federal laws divide into two categories: On the one hand, those regulating marihuana and 'narcotics,' like opium, heroin, morphine, cocaine and codeine; and, on the other hand, those regulating 'dangerous drugs,' including depressants, stimulants and hallucinogens." 56 Cal.L.Rev. 1, 13 (1968). The laws in the first category are administered by the Bureau of Narcotics as part of the Treasury Department. 26 U.S.C. §§ 4701–4776. The federal laws regulating dangerous drugs are administered by the Bureau of Drug Abuse Control which is within the Food and Drug Administration under the Department of Health, Education, and Welfare. 21 U.S.C. §§ 301–392. Id.

In 1965 Congress amended the Federal Food, Drug, and Cosmetic Act to give the Secretary of Health, Education, and Welfare the authority to regulate dangerous stimulants, depressants and hallucinogens. 21 U.S.C. § 321(v) (3) (Supp. I, 1965) amending 21 U.S.C. § 321 (1964). Ibid. The purpose of the amendments, as set forth in Senate Report No. 337, was to provide "increased controls over the distribution of barbiturates, amphetamines, and other drugs having a similar effect on the central nervous system." The controls are accomplished by making the unauthorized production, distribution and possession of such drugs criminal offenses. In ad-

dition, the 1965 amendments regulate production, distribution, and possession of controlled drugs by registration, record-keeping, inventory and inspection requirements. 1 U.S. Code Congressional and Administrative News, p. 1896 (89th Cong. 1st Sess. 1965). Almost immediately, under this amendment, the Secretary added several hallucinogens, including LSD.

Appellant's attack is directed to the above described amendment which provides in the applicable parts:

"(v) The term 'depressant or stimulant drug' means—* * * (3) any drug which contains any quantity of a substance which the Secretary, after investigation, has found to have, and by regulation designates as having, a potential for abuse because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect; except that the Secretary shall not designate under this paragraph, or under clause (c) of subparagraph (2), any substance that is now included, or is hereafter included, within the classifications stated in setion 4731 and marihuana as defined in section 4761, of Title 26."

Senate Report No. 337 provides the following information as part of the legislative history:

."Hallucinogens are drugs which affect the central nervous system in such a fashion as to cause the user to have a distorted sense of reality. The most prominent of the hallucinogenic drugs being abused today is d-lysergic acid diethylamide, more commonly referred to as LSD–25. This drug is sometimes used as an adjunct to psychotherapy and as a research tool in psychiatry. Its use by amateurs and drug abusers can cause some terrifying experiences for the victims. It is capable of producing prolonged psychiatric reactions in persons possessing a previous underlying personality problem, and can precipitate the acting out of anti-

---

2. These provisions were enacted as part of the Drug Abuse Control Amendments of 1965, Pub.L. 89–74 (July 15, 1965), 79 Stat. 226.

social-behavior patterns." 1 U.S. Code Congressional and Administrative News, p. 1898 (89th Cong. 1st Sess. 1965).

Appellant contends that the phrase "potential for abuse" is not a sufficient standard so as to sustain the delegated power by which the Secretary designated LSD as a dangerous hallucinogen subject to regulation and control. The phrase is elaborated upon in Senate Report No. 337, as follows:

"[T]he term 'depressant or stimulant drug' includes, in addition to barbiturates and amphetamines, any drug which contains any quantity of a substance which the Secretary, after investigation, '* * * designates as having a potential for abuse * * *.' The term 'drug abuse' was defined for purposes of the report of the President's Advisory Commission on Narcotic and Drug Abuse, submitted November 1, 1963, as existing when an individual takes drugs under any of the following circumstances;

(a) in amounts sufficient to create a hazard to his own health or to the safety of the community; or

(b) when he obtains drugs through illicit channels; or

(c) when he takes drugs on his own initiative rather than on the basis of professional advice.

It is not intended by the committee that a drug's potential for abuse be determined on the basis of the drug's having a potential for isolated or occasional nontherapeutic purposes. The committee feels that a drug's 'potential for abuse' should be determined on the basis of its having been demonstrated to have such depressant or stimulant effect on the central nervous system as to make it reasonable to assume that there is a substantial potential for the occurrence of significant diversions from legitimate drug channels, significant use by individuals contrary to professional advice, or substantial capability of creating hazards to the health of the user or the safety of the community.

The Secretary of Health, Education, and Welfare should not be required to wait until a number of lives have been destroyed or substantial problems have already arisen before designating a drug as subject to controls of the bill." 1 U.S. Code Congressional and Administrative News, p. 1899 (89th Cong. 1st Sess. 1965).

In the section-by-section analysis contained in the Senate Report it is said that "depressant or stimulant drugs" means, inter alia,

"(3) any drug which contains any quantity of substance which the Secretary, by regulation, designates as having a potential for abuse because of its depressant or stimulant effect on the central nervous system or because of its hallucinatory effect. (The so-called hard narcotics and marihuana are exempt from this last provision.) The designation of drugs (other than barbiturates and amphetamines) under the authority of section 3(a) would have to be through formal rule-making procedures (with opportunity for hearing and judicial review) and, as explained below, opportunity for consultation of an ad hoc scientific advisory committee." 1 U.S. Code Congressional and Administrative News, p. 1904 (89th Cong. 1st Sess. 1965).

Appellant makes no claim that there is any deficiency in the procedure required. It is only claimed that the standard is inadequate; therefore, the constitutional attack is limited to the adequacy of standards required under what seems to be an admitted power of Congress to delegate the control and supervisory functions to the Secretary.

Basically, to question the constitutionality of the delegation is to question the existence of dangers, or to balance the benefits of unregulated conduct against its dangers. To argue that unsupervised use of LSD entails no dangers is to ignore the obvious.

"In 1965 seventy-five LSD patients were admitted to Bellevue Hospital in New York; two of these patients had attempted to commit murder. In 1966 a man was charged with homicide after he killed his mother while apparently under the influence of LSD." 16 DePaul L.Rev. 365 (1968) (footnote omitted).

The American Medical Association recognized the danger of uncontrolled or unsupervised use of LSD in its Journal:

"Recent reports from European and American urban centers suggest that increased use of LSD has been associated with severe adverse reactions. The manufacturer has suspended production; a United Nations committee has called for immediate worldwide regulatory action; and the drug has been interdicted in the United States. Anxiety has been expressed that the drug may exaggerate psychoses and increase depressions, homicide, and addiction." 198 J.A.M.A. 190 (1966).

The Scientific American also indicates the threatened danger:

"Indiscriminate and widespread use of the hallucinogenic drug d-lysergic acid diethylamide (LSD) has brought an increase in hospital admissions for adverse reactions to the drug, according to three psychiatrists at the New York University School of Medicine." 214 Scientific American 50, 54 (Feb. 1966) (citations omitted).

"Mass media * * * regularly report incidents of the drug peril. It is said, for example, that LSD may cause physical birth defects and internal chromosone damage." 56 Cal.L.Rev. 1, 6 (1968) (footnote omitted).

The Constitution does not prohibit delegation. "The non-delegation doctrine is wholly judge-made. The Constitution provides merely: 'All legislative Powers herein granted shall be vested in a Congress of the United States * * *' The power is also granted 'to make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers.' Some congressional powers must obviously be delegated, including the powers 'to * * * collect taxes,' 'to borrow Money,' 'to coin Money,' and 'to raise and support Armies.' Delegation was not discussed at the Constitutional Convention, except that a motion by Madison that the President be given power 'to execute such other powers * * * as may from time to time be delegated by the national Legislature' was defeated as unnecessary." 1 Davis, Administrative Law § 2.02 (1958) (footnotes omitted).

In the area of drug regulation, delegations have been generally sustained despite broad standards of discretion. 1 Sutherland, Statutory Construction § 317 (3rd ed. 1943). This must necessarily be so, for with new drugs being discovered and introduced at an unprecedented rate, it would be impossible for Congress to determine beforehand those drugs to which it wishes a particular policy to be applied and to formulate specific rules for each situation. "[I]t then becomes constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." American Power Co. v. S.E.C., 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946). Another suggested approach, perhaps a similar one, is that the validity of delegation be tested more on the basis of safeguards rather than standards. 1 Davis, Administrative Law § 2.17 (1965 Supp.)

The consistent interpretation by the Department of Health, Education, and Welfare to regulate the drug traffic for the protection of the public health and welfare is also persuasive to us in construing the amendments. See Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed. 2d 179 (1964); Lincoln Bank & Trust Co. v. Exchange Nat'l Bank, 383 F.2d 695, 699 (10th Cir. 1967).

The real and substantial relation of LSD to the object sought to be controlled by the Drug Abuse Control Amendments of 1965[3] is described in detail by a con-

3. Supra, note 2.

sultant to the President's Commission on Law Enforcement and Administration of Justice in 45 Texas L.Rev. 1037, 1046, 1114 et seq. (1967).

We conclude Congress may properly delegate an executive duty to effectuate its legislative policy, United States v. Howard, 352 U.S. 212, 218–219, 77 S.Ct. 303, 352, 1 L.Ed.2d 261 (1957), and that the standard "potential for abuse" is sufficient in the light of its legislative history.

Affirmed.