**UNITED STATES of America ex rel. Anthony F. ORDOG, Jr., No. 40695, Petitioner,**

**v.**

**Howard YEAGER, Principal Keeper, New Jersey State Prison, Respondent.**

**Civ. 1199–67.**

United States District Court
D. New Jersey.

April 29, 1969.

Harry D. Ambrose, Jr., Camden, N. J., court assigned counsel for petitioner.

A. Donald Bigley, Camden County Prosecutor by John P. Jehl, Asst. Prosecutor, Camden, N. J., for respondent.

## OPINION AND ORDER

COHEN, District Judge:

The issue presented by this petition for a writ of habeas corpus is whether the principles of law set forth in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, decided May 20, 1968, and held to be retroactive in Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100, decided June 10, 1968, are applicable to the circumstances of this case, which was tried in May and June, 1964.

In *Bruton*, the Supreme Court overruled Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), and held that in a joint trial the admission into evidence of an extrajudicial statement [1] of one defendant incul-

1. Briefly, in Bruton, a postal inspector testified that one defendant (Evans) orally confessed to him, while in police custody, that he and his codefendant (Bruton) committed an armed robbery.

The jury was instructed to disregard the confessor's extrajudicial statement that his codefendant participated with him in committing the crime. On appeal, the Court of Appeals for the 8th Circuit

pating a codefendant violates the latter's right of cross-examination guaranteed to him by the Confrontation Clause of the Sixth Amendment. And this is so despite attempted curative *instructions to a jury to disregard such statement* in determining the guilt or innocence of the implicated codefendant. *Delli Paoli, supra,* decided in 1957, held that under the circumstances of that case, where there was other sufficient evidence to sustain a conviction, the extrajudicial declaration of a defendant inculpating a codefendant might very well be cured by appropriate limiting instructions to the jury. Such a principle was repudiated ten years later in *Bruton.* Three weeks thereafter in *Roberts,*[2] the Supreme Court declared the new principles of *Bruton* to be applicable to state prosecutions under the 14th Amendment and that the 6th Amendment principles enunciated *in Bruton* were to be applied in the courts retroactively.[3] In so determining, the

Court in *Roberts* stated at p. 294, of 392 U.S., at p. 1922 of 88 S.Ct.:

" 'We have * * * retroactively applied rules of criminal procedure fashioned to correct serious flaws in the fact-finding process at trial.' Stovall v. Denno, 388 U.S. 293, 298, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199. See Jackson v. Denno, 378 U.S. 368, 84 S. Ct. 1774, 12 L.Ed.2d 908; Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948; Linkletter v. Walker, 381 U.S. 618, 639, n. 20, 85 S.Ct. 1731, 14 L.Ed.2d 601; Johnson v. New Jersey, 384 U.S. 719, 727–728, 86 S.Ct. 1772, 16 L.Ed.2d 882; Compare Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314. Despite the cautionary instruction, the admission of a defendant's confession which implicates a codefendant results in such a 'serious flaw' * * * the error 'went to the basis of fair hearing

reversed the confessor's conviction on the ground that the oral confession introduced by the postal inspector was obtained in violation of the principles declared in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (June 20, 1966), decided one week before the Bruton trial commenced. However, relying upon the law as stated in Delli Paoli, it affirmed the implicated defendant's conviction. The United States Supreme Court granted certiorari expressly to reconsider Delli Paoli, which it thereafter overruled.

2. In Roberts, the facts were similar to those in Bruton, except that Bruton involved a federal prosecution, whereas Roberts involved a state prosecution. Briefly, the facts were that Roberts was convicted by a jury of armed robbery at a joint trial with a codefendant (Rappe). A police officer testified that the codefendant orally confessed to him that petitioner and she had committed the crime. The jury was instructed that the confession was admissible against the confessor, but that her statements implicating Roberts were not to be considered in determining his guilt or innocence. The Tennessee Supreme Court affirmed the petitioner's conviction. Petitioner was denied a writ of habeas corpus by the United States District Court for the

Middle District of Tennessee on the authority of Delli Paoli. The Court of Appeals for the Sixth Circuit affirmed. The United States Supreme Court reversed, holding that the constitutional error " 'went to the basis of fair hearing and trial because the procedural apparatus never assured the [petitioner] a fair determination' of his guilt or innocence."

3. On the same day the United States Supreme Court in 392 U.S. 297, et seq., 88 S.Ct. 2064, 20 L.Ed.2d 1113, applied those rulings to vacate and remand Bujese v. U. S. and Jones v. U. S. in the Second Circuit Court of Appeals; Schnable et al. v. Fla., Supreme Court of Fla. and Williams v. Fla. and Hillman v. Fla., in the District Court of Appeals for Florida; Pickens v. Oliver, Supreme Court of California; Santoro v. U. S. and Nelson v. U. S. in the Ninth Circuit Court of Appeals; Hunt v. Conn., Supreme Court of Connecticut; Serio v. U. S., Court of Appeals, D. C.; and McCarthy et al. v. Kansas, Supreme Court of Kansas. One week later, the same rulings were made in Wheat v. Wash., Supreme Court of Washington; Hooper v. La., Supreme Court of Louisiana; and Wade v. Yeager, in the Third Circuit Court of Appeals. 392 U.S. 652, 658 and 661, 88 S.Ct. 2302, 2281 and 2291, 20 L. Ed.2d 1357, 1347 and 1352.

and trial because the procedural apparatus never assured the [petitioner] a fair determination' of his guilt or innocence."

We are obliged to examine this petition and the record of this case in light of these recent rulings. The petitioner, Anthony F. Ordog, Jr., was indicted by the Camden County Grand Jury, together with Gary Rush and Russell Rush, for the crime of felony-murder. The State of New Jersey contended that on January 18, 1962, during the perpetration of an armed robbery at the Farm Tavern located in Winslow Township, Camden County, Russell Rush, armed with a shotgun, and Gary Rush, armed with a claw hammer, terrorized the patrons of the tavern in the course of the robbery; relieved a customer and one of the proprietors of their wallets; emptied the cash register of its contents; and, when Mary Tilton, co-owner of the tavern, who was behind the bar at the time, denied having any more money, she was shot at close range and killed by Russell Rush. The prosecution contended further, that the petitioner was the driver of the "getaway" car waiting outside the tavern.

Upon the initial arraignment, all three named defendants pleaded not guilty. Thereafter, they all changed their pleas to *non vult*. Subsequently, petitioner and Gary Rush retracted their pleas and reentered pleas of not guilty; Russell Rush's plea of *non vult* remained.[4] During all these proceedings, the defendants were each represented by assigned counsel. On two occasions, petitioner's counsel moved for a severance pursuant to R.R. 3:5–7, Rev.N.J.Rules of Crim.Pract. and Proceed., which applications were denied. At trial, the State did not seek the death penalty[5] and, under the circumstances, could not conscientiously do so.[6] Both defendants were found guilty and the jury recommended life imprisonment. Both appealed directly to the New Jersey Supreme Court, which unanimously affirmed the convictions. State v. Ordog, 45 N.J. 347, 212 A.2d 370 (1965), cert. den. 384 U.S. 1022, 86 S.Ct. 1942, 16 L.Ed.2d 1025 (June 20, 1966).

The reasons urged here by petitioner for habeas corpus relief on constitutional grounds are substantially the same as those raised in the State Court seeking reversal of the conviction. Aside from attacking the voluntariness of his own alleged confession and the alleged prejudicial summation of the prosecutor, petitioner principally maintains that he was denied a fair trial (1) by reason of the rejection of his timely motions for a severance; (2) by the admission in evidence of declarations contained in an alleged confession of the codefendant Gary

---

4. Russell Rush pleaded non vult to Indictment No. 631–62 charging him with murder and to several other indictments charging armed robbery. Sentence of life imprisonment for murder and terms of imprisonment of 12½ to 15 years and 2½ to 5 years for armed robbery, on two counts of Indictment No. 633–62, were imposed in 1964 by the Camden County Superior Court, the armed robbery sentences to run concurrently with the murder sentence. Thereafter, he sought a writ of habeas corpus in this Court, which was denied by another judge on August 8, 1968. Civil No. 1198–67. Inquiry of the Clerk of this Court reveals that no petition is pending by Gary Rush.

5. Under New Jersey Law, the penalty for felony-murder, as well as for first degree murder, is death, unless the jury recommends life imprisonment. 2A:113-4, N.J.

S.A. Upon recommendation of the prosecuting attorney, and acceptance by the Court, a plea of non vult may be entered, in which case the maximum penalty that may be imposed is that of life imprisonment. 2A:113-3, N.J.S.A.

6. It may reasonably be inferred that in view of the Court's acceptance of a plea on non vult from Russell Rush, the actual killer, thereby sparing his life, the likelihood of the return of the death penalty against the petitioner and Gary Rush was rather remote. And the changing of pleas from not guilty to non vult and back to not guilty again, by the petitioner and Gary Rush, may have been dictated by the strategy of defense counsel who, in view of the likely foreclosure of the death penalty, had little or nothing to lose by standing trial.

Rush, implicating the petitioner [7] to an extent unremedied by the trial court's limiting instructions to the jury, and especially so inasmuch as Gary Rush repudiated his alleged confession, attacking its voluntariness and interposing a defense of insanity; and (3) by the admission into evidence of the hearsay testimony of Dr. James Spradley, a psychiatrist produced by the State in rebuttal of Gary Rush's defense of insanity. Inasmuch as all three of these contentions are correlated, they shall be considered in one context.

Severance having been denied, the core of our problem is whether the admissions into evidence of the extrajudicial confession and the declarations of Gary Rush to Dr. Spradley inculpating the petitioner were such as fatally infected the trial. Dr. Spradley testified that during the course of his examination of Rush, seeking to determine his mental competency, he elicited a "history" from him in which Rush implicated the petitioner not only in the crime in question but in numerous others as well. Strenuous and persistent objections, both out of and in the presence of the jury, were made by counsel to the admission of this testimony inculpating the petitioner (T 1873–1930).[8] The trial court permitted this testimony before the jury upon the doctor's representation that he considered such information, even though implicating the petitioner, an essential factor for the formulation of his professional opinion

regarding the mental status of Gary Rush. It should be observed that, unlike Gary Rush, no defense of insanity was interposed on behalf of the petitioner.[9]

In keeping with a line of New Jersey decisions and consonant with the ruling in *Delli Paoli*, the trial court, at the time of the admission into evidence of Rush's alleged confession implicating the petitioner, and as well upon the introduction of Dr. Spradley's rebuttal testimony, and later in its charge, carefully and clearly cautioned the jury that all these extrajudicial statements inculpating the petitioner were to be limited to the extent that they pertained to Gary Rush only and could not be considered by them in determining the guilt or innocence of the petitioner. Additionally, in regard to the testimony of Dr. Spradley, the jury was admonished that this expert testimony was admitted solely for the purpose of providing psychiatric background and foundation for the doctor's opinion respecting the mental competency of Gary Rush and was not offered for the truth of the reported declarations.

On appeal, the New Jersey Supreme Court, insofar as the challenged testimony of Dr. Spradley was concerned, relied on their holding in State v. Lucas, 30 N.J. 37 at pp. 79–80, 152 A.2d 50 (1959), which in turn relied on 2 Wigmore on Evidence (3d ed. 1940), § 228, p. 14; 6 Wigmore, supra, § 1790; and McCormick, § 288, at pp. 467–468. In *Lucas*, however, the challenge was di-

---

7. Similarly, the petitioner in his alleged confession implicated Gary Rush. Interestingly enough, the killer Russell Rush testified for the State regarding the criminal event but did not implicate either Gary Rush or the petitioner. He admitted to being accompanied by two men, neither of whom was a defendant, that the loot was $92.00 and that he did the killing. (T 1314–1342).

8. "Mr. DiMartino: I don't want to belabor the point, but I think I must place on the record my objection to your Honor's ruling, and I don't think that any instructions that your Honor can give this jury can eradicate from their minds the fact that the doctor did say it (implicating Ordog in this and in other crimes)

\* \* \* that he (Dr. Spradley) can eliminate a portion which has nothing to do with Gary Rush \* \* \*" (T 1894). And again at T 1894, 1897, 1912, 1923 and 1930.

9. However, the petitioner, in support of his contention that his own confession was induced by coercive police tactics, offered psychiatric testimony of mental retardation, poor judgment and subliminal intelligence. As stated by the New Jersey Supreme Court on the appeal: "The proofs, viewed in a light most favorable to him, indicate that he is retarded (but not mentally deficient) his judgment is very poor, and he is very suggestive and easily led." 45 N.J. at p. 359, 212 A.2d at p. 376.

rected to the admission of statements of guilt against an accused who related such statements to the psychiatrist and not, as in this case, affecting a codefendant. And, insofar as the challenged evidence of Gary Rush's alleged confession implicating the petitioner was concerned, the New Jersey Supreme Court relied on *Delli Paoli.* In both instances, the New Jersey Supreme Court held such evidence properly admissible when coupled with carefully limiting instructions to the jury as to its singular effect upon the relator and the confessor, Gary Rush, and not upon the petitioner. State v. Ordog, *supra,* 45 N.J., at pp. 355–357, 212 A.2d 370. Significantly, certiorari was denied on June 20, 1966, 384 U.S. 1022, 86 S.Ct. 1942, 16 L.Ed.2d 1025. Such was the state of the law when the New Jersey Supreme Court was confronted with the instant problem of an extrajudicial statement implicating a codefendant. However, since the rulings in *Bruton* and *Roberts,* wherein the inculpation was not as damaging as that presented here, attempted curative instructions cannot remedy the fatal and unconstitutional infection of the fact-finding and truth-determining process under the circumstances *sub judice* as they pertain to this petitioner. See *Bruton,* 391 U.S. at 126, 88 S.Ct. at 1622:

> "We hold that, because of the sub-substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. We therefore overrule Delli Paoli and reverse."

It is noteworthy that the dissent in *Delli Paoli* (352 U.S. 246, 77 S.Ct. 294, 1 L.Ed.2d 278), written by Mr. Justice Frankfurter, in which Justices Black, Douglas and Brennan joined, has become the majority view now expressed in *Bruton.* Mr. Justice Frankfurter, at pp. 247–248, 77 S.Ct. at p. 302, with astute insight analyzed the problems of joint trials and with characteristic foresight suggested the present resolution, as follows:

> " * * * One of the most recurring of the difficulties pertains to incriminating declarations by one or more of the defendants that are not admissible against others. The dilemma is usually resolved by admitting such evidence against the declarant but cautioning the jury against its use in determining the guilt of the others. The fact of the matter is that too often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors. The admonition therefore becomes a futile collocation of words and fails of its purpose as a legal protection to defendants against whom such a declaration should not tell. While enforcing the rule of admitting the declaration solely against a declarant and admonishing the jury not to consider it against other defendants, Judge Learned Hand, in a series of cases, has recognized the psychological feat that this solution of the dilemma demands of juries. He thus stated the problem:

> > " 'In effect, however, the rule probably furthers, rather than impedes, the search for truth, and this perhaps excuses the device which satisfies form while it violates substance; that is, the recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody else's.' Nash v. United States, 2 Cir., 54 F.2d 1006, 1007.

> "It may well be that where such a declaration only glancingly, as it were, affects a co-defendant who cannot be charged with the admitted declaration, the rule enforced by the Court in this case does too little harm not to leave its application to the discretion of the trial judge. But where the conspirator's statement is so damning to another against whom it is inadmissible, as is true in this case, the difficulty of

introducing it against the declarant without inevitable harm to a co-conspirator, the petitioner in this case, is no justification for causing such harm. The Government should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds. * * *

"It is no answer to suggest that here the petitioner-defendant's guilt is amply demonstrated by the uninfected testimony against him. That is the best of reasons for trying him freed from the inevitable unfairness of being affected by testimony not admissible against him. In any event, it is not for an appellate tribunal to know how the jury's mind would have operated if powerfully improper evidence had not in effect been put in the scale against petitioner."

The obvious futility of remedial instructions to a jury, however emphatic, was emphasized in *Bruton* at pp. 135–136 of 391 U.S., at p. 1627 of 88 S.Ct.:

"[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored * * * Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial."

And further, at page 137, 88 S.Ct. at page 1628:

"Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all."

■ We are confronted in the present case with something more than the now denounced implication by one defendant of his codefendant's guilt of the crime charged. This harm was pyramided by the testimony of Dr. Spradley's recitation of the alleged declarations made to him by Gary Rush inculpating the petitioner in this and in other crimes. The admission of such tainted evidence was sought to be justified as an essential factor in the foundation upon which the doctor formulated his professional opinion as to the mental competency of Gary Rush.[10] This rationalization purports to make an expert's choice of bases for his opinion more important to the jury's fact-finding process than the petitioner's constitutional right to a fair trial. Generally, whether or not such evidence causes fatal infection of the truth-determining process at trial is a question of logical probabilities. Johnson v. New Jersey, 384 U.S. 719, 729, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). The likelihood of the challenged testimony, adversely affecting the petitioner on the issue of his guilt or innocence so as to fatally infect the trial, seems abundantly clear.[11]

The potentiality of infection is emphasized when, other than the confession of the petitioner the voluntariness

10. Defense counsel persistently sought to have the doctor state that the mention of the name Ordog, per se, was not absolutely essential to the basis for his opinion. The doctor refused, insisting that he could not do so. A reading of the transcript casts grave doubt upon the psychiatric need for the inculpating references to the declarant's codefendant. There was ample testimony both from Dr. Spradley and Dr. H. E. Yaskin, a psychiatrist with eminent qualifications, rebutting the defense of insanity without the necessity of any mention of the petitioner whatsoever, especially when the probability of harm was so evident and so devastating.

11. Dr. Spradley:
"We then asked him (Gary Rush) if he knew one Anthony Ordog, and he said Tony Ordog drove the car, he stayed out in the car. (T 1925).

of which was under attack, the challenged confession of Gary Rush implicating the petitioner, and the strenuously contested testimony of Dr. Spradley, the State's proofs were rather meager. If, as was stated in Burgett v. Texas, 389 U.S. 109, at p. 115, 88 S.Ct. 258, at p. 262, 19 L.Ed.2d 319,

> "The admission of a prior criminal conviction which is constitutionally infirm under the standards of Gideon v. Wainwright is inherently prejudicial and we are unable to say that the instructions to disregard it made the constitutional error 'harmless beyond a reasonable doubt' within the meaning of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.",

then, how "inherently prejudicial" was Dr. Spradley's testimony, repeated on several occasions,[12] that Gary Rush implicated the petitioner not only in this offense but in other robbery escapades perhaps "a hundred in number" (T 1934) and in one of which a "man was shot" (T 1926) but no proof was offered of any prior conviction of any of these alleged robberies? Not only was such infection "probable," as referred to in *Johnson*, but the verdict cannot meet the test of a fair trial as set forth in Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963):

> "We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have

contributed to the conviction." 375 U.S. 86–87, 84 S.Ct. 230.

See also, Justice Frankfurter's dissent in *Delli Paoli, supra*. Another way of stating the test for ascertaining fatal unconstitutional infection of fair trial may be found in Chapman v. California, 386 U.S. 18 at page 24, 87 S.Ct. 824 at page 828 (1967), regarding prejudicial comment by a prosecutor upon a defendant's failure to testify:

> "We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

A corollary of the criteria set forth in *Chapman* is that when the admission of very questionable testimony to which strenuous, persistent, and serious objections are made, as in this case, a trial judge is confronted with the threshold determination of placing the proffered evidence in the scales and balancing the probative value of the evidence offered for a certain purpose as against the potential prejudice to a defendant or a codefendant. If the evidence is or tends to be prejudicial, before he can admit it, he must find that it is harmless beyond a reasonable doubt in constitutional effect—a formidable barrier indeed.

Applying the foregoing criteria for a fair trial in the constitutional sense, to the circumstances here, can it be said with any reasonable conviction that Gary Rush's extrajudicial implication of the petitioner in this and in other crimes,

---

Dr. Spradley:

" * * * he (Ordog) was with us, he was driving the car, he was also with us outside the motel when that man was shot, he was on all the jobs, I wasn't with him all the time, he went with Russell [Rush] when I didn't go." (T 1926).

Dr. Spradley:

"We then asked him [Gary Rush] how many times he thought he went alone (sic along) with Russell Rush and Tony [Ordog] in their robbery escapades, and he stated he could not recall the names or the numbers of these escapades. We ques-

tioned whether or not it might be a hundred in number, he answered it could be a hundred I don't know." (T 1934).

Dr. Spradley:

"In answer to a specific question, he [Gary Rush] stated that Tony [Ordog] the driver that went with him on these various misdemeanors, crimes, as far as he was concerned was never pressured into going. He seemed very willing to accompany Russell [Rush] on their various robberies. (T 1936–7).

12. See 11 ante.

compounded by the damaging testimony of Dr. Spradley, did not adversely affect the petitioner on the question of his individual guilt or innocence? Or, can it be said that this was harmless federal constitutional error beyond a reasonable doubt, or that it only "glancingly" affected the petitioner? Or, that the jury implicitly followed the court's instructions and completely eradicated from their minds all declarations by Gary Rush of the petitioner's guilt in this and other "robbery escapades * * * a hundred in number" (T 1934) and based its conviction of the petitioner on other rather meager and circumstantial evidence in the case? As Mr. Justice Frankfurter in his *dissent* in *Delli Paoli* observed, how can anyone in retrospect know "* * * how the jury's mind would have operated if powerfully improper evidence had not in effect been put in the scale against petitioner"? (352 U.S. 248, 77 S.Ct. 303, 1 L.Ed.2d 278) How can anyone reasonably ascertain upon just what evidence the jury relied, proper or incompetent or prejudicial, in determining their verdict? It is submitted that no reasonable man can answer any of these queries in the affirmative.

■ The probability of petitioner's guilt in view of his prior plea of *non vult* does not, however, deprive him of a right to a constitutionally fair trial. Hindsight works many wonders and now demonstrates that a severance should have been granted. True, joint trials are often indicated by circumstances which render them timesaving, convenient and economical assuming, of course, that no obvious prejudice will result to the defendants on the issue of their individual guilt or innocence. Until the time of *Bruton*, it was fundamentally a matter of potential prejudice and legally effective cure. However, since *Bruton* emphatically repudiated the basic premise in *Delli Paoli* that a jury can and will heed a trial judge's cautionary and limiting instructions, thereby "curing" the potential prejudice engendered by extrajudicial inculpatory statements implicating a codefendant, the judicious supposition of economy and dispatch provided by joint trials [13] must, of necessity, give way to the paramount judicial concern for the constitutional protection of a codefendant.

When we consider the instant record, in light of *Chapman, Bruton* and *Roberts*, reluctant as we may be to disturb a conviction for a felony-murder which was upheld by the New Jersey Supreme Court, the further development of the law since that affirmance clearly mandates but one course: constitutional protection rather than administrative convenience. Such a course was anticipated in State v. Young,[14] 46 N.J. 152, 215 A. 2d 352 (1965) resulting in the adoption of a new rule of criminal procedure in New Jersey,[15] and referred to in the re-

---

13. Factors prompting joint trials seem of little value when weighed against the risk of substantial prejudice to a defendant and the potentiality of lengthy appeals, loss of witnesses, and retrials. There is no dispatch here, certainly no convenience and surely greater expense.

14. The New Jersey Supreme Court in State v. Young, 46 N.J. 152, 157–158, 215 A.2d 352 cited with approval the following quotation from Kramer v. United States, 115 U.S.App.D.C. 50, 317 F.2d 114 (1963):

"The better rule is that when deletion of the hearsay reference to a codefendant is feasible * * * an instruction by the court that the jury disregard the reference is not an adequate substitute for deletion." 317 F.2d 117.

15. "*Motion by State Before Trial.* If 2 or more defendants are to be jointly tried and the prosecuting attorney intends to introduce at trial a statement, confession or admission of one defendant involving any other defendant, he shall move before trial on notice to all defendants for a determination by the court, in camera, as to whether such portion of the statement, confession, or admission involving such other defendant can be effectively deleted therefrom. The court shall direct the specific deletions to be made, or, if it finds that effective deletions cannot practically be made, it shall order separate trials of the defendants. Upon failure of the prosecuting attorney to so move before trial, the court may refuse to admit such statement, confession or admission into evidence at trial,

cent case of State v. Barnett, 53 N.J. 559, 252 A.2d 33 (decided April 7, 1969), wherein Justice Jacobs discusses the feasibility of a trial court's deletion of inculpatory statements made by one defendant of another, and states:

"If such effective deletion is not feasible, separate trials are required since cautionary instructions will no longer suffice. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed. 2d 476 (1968); Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968)."

■ Thus, it would appear that most of the problems attendant to joint trials and to procedural motions for severance have come full circle, but perhaps not to full rest.[16] However, it seems without doubt that the grant of a severance in the instant case, or an appropriate deletion of the damning implications of the petitioner in this, as well as other crimes, would have eliminated the evil which effectively destroyed his constitutional right to a fair trial.[17]

■ It should be observed that the doctrine of exhaustion of state court remedies, prior to seeking federal habeas corpus relief under 28 U.S.C. § 2254, is in the interest of comity affording the state court first opportunity to determine the merits of a challenge directed to that State's compliance with federal law. United States of America ex rel. White v. State of New Jersey, 287 F. Supp. 685 (D.N.J.1968). But at the same time, the doctrine does not delimit the federal power of habeas corpus, 28 U.S.C. § 2241. This doctrine of exhaustion of state remedies is one which governs the proper exercise of power and is rooted in consideration of comity rather than in the scope of federal habeas corpus jurisdiction. Hammond v. Lenfest, 398 F.2d 705 (2 Cir. 1968). Deference to the state court's post-conviction relief procedure might well result in further delay. Far too much unavoidable delay has been occasioned.[18] See: United States of America ex rel. Boyance v. Myers, 372 F.2d 111, 113 (3 Cir. 1967).

---

or take such other action as the interest of justice requires." R.R. 3:15–2(a), as recently amended, effective September 8, 1969.

16. Here of late it seems that Bruton is being revisited weekly. Sundry distinctions are sought to be made. See the Second Circuit's holding in Wapnick v. United States, 406 F.2d 741 (Feb. 26, 1969); Arizona Sup.Ct., Olivas v. Eyman, 104 Ariz. 1103, 449 P.2d 942 (Feb. 26, 1969); Kentucky Court of Appeals, Polsgrove v. Commonwealth, Ky., 439 S.W.2d 776 (Feb. 26, 1969); Illinois Supreme Court, People v. Rhodes, 41 Ill.2d 494, 244 N.E.2d 145 (Feb. 26, 1969); Maryland Ct. of App., Clark v. State, 6 Md.App. 91, 250 A.2d 317 (March 5, 1969); Third Circuit, United States v. Lipowitz, 407 F. 2d 597 (March 5, 1969); Eighth Circuit, Caton v. United States, 407 F.2d 367 (March 5, 1969); Supreme Court of Washington, State v. Aiken, 452 P.2d 232 (April 16, 1969); Supreme Judicial Court of Massachusetts, Commonwealth v. Scott, 245 N.E.2d 415 (March 11, 1969); U. S. D. C. Connecticut, Amaio v. Reincke, 300 F.Supp. 367 (March 12, 1969); Ct. Military Appeals, U. S. v. Gooding, 5 Cr.L. 2025 (April 9, 1969), and Supreme Court of Arizona, State v. Taylor, 104

Ariz. 264, 451 P.2d 312 (April 16, 1969). Cf: Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (U. S. April 22, 1969).

17. The determination here setting aside the conviction as having been based at least in part upon unconstitutional evidence, of course, leaves the State of New Jersey free to retry the petitioner without the tainted evidence. See: Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (U. S. March 25, 1969).

18. The original petition was filed November 20, 1967, and assigned to Judge Madden of this Court. Due to his serious illness resulting in his recent retirement, this matter, among others, was reassigned to this writer on November 12, 1968. The petitioner submitted a letter memorandum on January 20, 1969, referring to the cases of Bruton and Roberts, herein, supplementing the voluminous brief supplied with the original petition. Additionally, petitioner requested the appointment of counsel to represent him, which request was granted on March 12, 1969, and who in turn consulted with the petitioner and filed his memorandum on April 7, 1969.

Consideration of comity aside, where the error is of such federal constitutional dimension as the denial of a fair trial, a federal court having concurrent habeas corpus jurisdiction is obliged to act with alacrity for the trilogy of *Chapman, Bruton* and *Roberts* binds us all.

Accordingly, a writ of habeas corpus shall issue discharging the petitioner from the illegal custody of the respondent.

Now, therefore, it is on this 29th day of April, 1969 ORDERED that a writ of habeas corpus issue directed to Howard Yeager, Principal Keeper of the New Jersey State Prison, at Trenton, New Jersey, to return Anthony F. Ordog, Jr. to Camden County to there plead or stand trial on Indictment No. 631–62.