UNITED STATES v. BRAVERMAN.

No. 506.   Argued April 22, 1963.—Decided May 27, 1963.

*Frank I. Goodman* argued the cause for the United States by special leave of Court *pro hac vice.*   With him on the brief were *Solicitor General Cox, Assistant Attorney General Miller, Beatrice Rosenberg* and *Jerome M. Feit.*

No appearance for the appellee.

MR. JUSTICE BLACK delivered the opinion of the Court.

Appellee, Jerry Braverman, was transportation manager of the Burbank, California, distribution office of the Andrew Jergens Company, which ships goods in interstate commerce.   In June 1962 he was indicted in a United States District Court and charged with having violated § 1 of the Elkins Act [1] by having knowingly solicited from a freight forwarder concessions and rebates respecting interstate motor carrier shipments of Jergens' goods so that, had the rebates been granted, goods would have been shipped at a lower rate than that named in the applicable tariffs filed with the Interstate Commerce Commission. The indictment did not allege, and all parties agreed that the Government did not intend to prove, that the rebate would have been for the benefit of the shipper.   The dis-

[1] 49 U. S. C. § 41 (1).

trict judge, believing that the Act applies only where some "advantage or discrimination is practiced in favor of the shipper," ruled that the indictment did not charge an offense under the statute and therefore must be dismissed. The case is properly here on appeal under 18 U. S. C. § 3731.

We have concluded that the Elkins Act outlaws solicitations of rebates by any person whatever, no matter for whose benefit the rebate is sought, and that therefore the District Court erred in dismissing the indictment. Section 1 aims in unmistakable language at preserving published tariffs inviolate. That section, first, makes it a misdemeanor for a carrier to fail "strictly to observe" published tariffs and, second, goes right on to make it unlawful "for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination" as to interstate shipments of property "whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier . . . ." More unequivocal language would be hard to imagine. It strikes at any and every kind of rebate, no matter by whom or to whom given. Nowhere does the section say or imply that rebates are unlawful only if they are given to or are for the benefit of a shipper. It is a rebate, to whomever given, which the statutory language proscribes.

The legislative history of the Elkins Act bears out the conclusion that Congress intended to prevent any kind of departure from the published rates and to that end outlawed all rebates, without requiring a showing of benefit to any shipper. The original Interstate Commerce Act,[2] passed in 1887, made it unlawful for any carrier to charge either more or less than the rate specified in its published

---

[2] 24 Stat. 379.

schedule of rates.[3] But the Interstate Commerce Commission, after a decade of experience with the Act, recounted in its Annual Reports to Congress between 1897 and 1902 the secrecy with which rebates were cloaked, the impossibility of enforcing tariffs when the Government had to prove not only a departure but also a benefit to one shipper not received by another, and the pressing need to invoke penalties simply upon showing a departure from a published rate.[4]

These urgings led to the passage of the Elkins Act. A Committee of the House of Representatives, in hearings on several bills proposing amendments to the Interstate Commerce Act, was told by the Chairman of the Interstate Commerce Commission that the existing law was "[i]n some important respects . . . practically unworkable." In particular, he reported the virtual impossibility of showing that a rebate had resulted in an "actual discrimination" among shippers and agreed with a member of the Committee that "any departure" from the published rates should be made an offense.[5] In its favorable report on the bill which became the Elkins Act, the Committee observed that it was "practically impossible to show the discrimination" and recommended passage of its proposal making it "a penal offense to. make any departure from the published rates whether there be a discrimination or not." [6]

This Court has already held that the sanctions of the Act are not restricted to carriers or shippers and that "any

---

[3] 24 Stat. 381.

[4] Annual Reports, Interstate Commerce Commission, Dec. 6, 1897, pp. 46–48, Dec. 24, 1900, p. 10, Jan. 17, 1902, p. 8.

[5] Hearings on H. R. 146, 273, 2040, 5775, 8337, and 10930 before the House Committee on Interstate and Foreign Commerce 197–199 (1902).

[6] H. R. Rep. No. 3765, 57th Cong., 2d Sess. 5 (1903). The bill passed the House by a vote of 250 to 6, 36 Cong. Rec. 2159 (1903), having already passed the Senate, 36 Cong. Rec. 1633–1634 (1903).

person" as used in § 1 means "any person." [7] It was there recognized that, in order to ensure carrier efficiency, rates must be maintained unimpaired and that the Elkins Act no more intended to allow third persons to tamper with the statutory scheme than it intended to allow carriers and shippers themselves to do so. And in an analogous situation, this Court has held that railroad employees who charge passengers more than the established rates are punishable under the Interstate Commerce Act even though they acted for their own gain and even though the railroad was not a party to their conduct.[8]

We have considered the statute before us in light of the salutary rule that criminal statutes should not by interpretation be expanded beyond their plain language.[9] But neither can we interpret a statute so narrowly as to defeat its obvious intent.[10] Congress, the Commission, and the public were concerned to make certain that, once a tariff had been published, no deviations whatever from that tariff would take place. Nowhere can we find support for the suggestion that some departures were to be checked while others were to be allowed. We would ignore the express language of the Elkins Act, the economic ills which gave rise to its passage, the objects which the framers of the statute had in mind, and the subsequent judicial enforcement of the Act if we limited its operation to only some kinds of rebates or to only some people.

---

[7] *Union Pac. R. Co.* v. *United States,* 313 U. S. 450, 463 (1941). The lower courts soon after the passage of the Elkins Act rejected the argument that the Act reached only the carrier and the shipper and held that it was immaterial that rebates were paid to someone other than the shipper. *E. g., United States* v. *Milwaukee Refrigerator Transit Co.,* 145 F. 1007, 1012 (C. C. E. D. Wis. 1906); *United States* v. *Delaware, L. & W. R. Co.,* 152 F. 269, 273 (C. C. S. D. N. Y. 1907).

[8] *Howitt* v. *United States,* 328 U. S. 189 (1946).

[9] See *United States* v. *Resnick,* 299 U. S. 207, 209–210 (1936).

[10] See *United States* v. *Raynor,* 302 U. S. 540, 552 (1938).

Congress wanted rates to be published and honored. It wanted rebates stopped. It used fitting language to accomplish that end. We hold that an indictment under § 1 of the Elkins Act states an offense when it charges that a person has solicited a rebate from a common carrier respecting the transportation in interstate commerce of a shipper's property, even though it is not alleged that the rebate was for the benefit of the shipper.

*Reversed and remanded.*