UNITED STATES of America, Appellant,

v.

David B. CHARNAY et al., Appellees.

No. 75–1222.

United States Court of Appeals,
Ninth Circuit.

May 7, 1976.

Rehearing and Rehearing En Banc
Denied July 8, 1976.

David Ferber, Sol. (argued), Securities and Exchange Commission, Washington, D. C., for appellant.

Moses Lasky (argued), of Brobeck, Phleger & Harrison, San Francisco, Cal., for appellees.

## OPINION

Before BROWNING and SNEED, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

This appeal from an order dismissing the indictment presents the question of whether the indictment, alleging a market manipulation artificially depressing the market price of a security on a national securities exchange, was sufficient to charge the defendants-appellees with a conspiracy to violate, and the violation of, the antifraud provisions of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78ff, Rule 10–b promulgated thereunder, and the wire fraud statute, 18 U.S.C. § 1343. We conclude that the indictment was sufficient to allege a criminal offense and reverse.

*Charges against Defendants-Appellees*

Two indictments were returned against defendants-appellees. The first, filed December 27, 1973, alleged that conduct of Howard Hughes and his associates in taking over Air West, especially certain guarantees against trading losses given by Hughes, violated 15 U.S.C. §§ 78i(a)(2), 78j(b), 78ff and Securities and Exchange Commission (SEC) Rule 10b–5 (manipulation of security prices, employment of manipulative devices), and 18 U.S.C. §§ 2, 3, 4, 371 and 1343 (aiding and abetting, accessory after the fact, misprision of a felony, conspiracy, and wire fraud). This indictment was dismissed on January 30, 1974, for failure to state an offense. The Government did not appeal the dismissal. A second indictment was returned on July 30, 1974 charging that the appellees' conduct in the Air West acquisition was in violation of 15 U.S.C. §§ 78j(b), 78ff and Rule 10b–5 and 18 U.S.C. §§ 2, 371, and 1343, thus omitting reference to 15 U.S.C. § 78i(a)(2) (manipulation of security prices) and 18 U.S.C. §§ 3 and 4 (accessory after the fact, misprision of a felony). The second indictment was dismissed on November 13, 1974 and is the subject of this appeal.

The defendants were identified in the indictment, for the period in question, as

* Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation.

follows: Hughes was the sole stockholder and managing agent of Hughes Tool, a Delaware corporation. Davis was legal counsel for Hughes Tool. Maheu was chief executive officer of Hughes/Nevada Operations. Charnay was a principal stockholder of a private corporation authorized to purchase and sell stocks. Two unindicted co-conspirators were also identified: Herman Greenspun, a newspaper publisher and owner of stock in Air West, and George Crockett, an owner of Air West stock. Air West is a Delaware corporation whose stock was listed and traded on the American Stock Exchange (the AMEX).

Both indictments detailed essentially the same facts as a basis for the charges against appellees. These facts were well summarized by the district court:

"The background facts alleged in the Indictment are that in August of 1968, defendants made an offer on behalf of Hughes Tool Company to acquire all the assets of Air West at a price which would yield to the stockholders approximately $22 per share; that on December 28, 1968, a majority of the stockholders voted to accept the offer; that on the same day a majority of the directors voted to reject the offer; that in order to coerce the directors to change their vote, defendants would threaten the opposition directors with lawsuits, would file such lawsuits and would artificially depress the price of Air West stock on the American Stock Exchange by causing Charnay to sell 59,-100 shares of Air West stock 'short,' by causing Herman Greenspun to sell 15,000 shares of Air West stock and by causing Crockett to sell 12,000 shares of Air West stock on the American Securities Exchange, and at the same time, guaranteeing to these sellers by secret understanding a recovery of $22 per share irrespective of the price obtained on the Exchange. It is alleged that these activities caused a decline in the market price of Air West stock on December 31, 1968 from $18 per share to $15.75 per share."

The Government contends that the "aftermath" of these activities was a reversal by Air West's directors of their earlier position and a decision on December 31 to sell Air West's assets to Hughes Tool.

### The Indictment

*Count I*

The July 30, 1974 indictment contains four counts. The first ten paragraphs of Count I identify the parties and describe their roles in the corporate takeover. Paragraphs 11 through 13 allege that (1) the defendants and the unindicted co-conspirators willfully and knowingly conspired and agreed to violate the securities laws, 15 U.S.C. §§ 78j(b), 78ff and Rule 10b–5; (2) the defendants and co-conspirators used the instrumentalities of interstate commerce, the mails, and the facilities of a securities exchange to conduct a manipulative scheme in contravention of the securities laws; and (3) the conspirators transmitted by wire interstate communications to induce the directors who had voted against the Hughes Tool Company proposal of Air West to change their votes, thus depriving the directors and shareholders of the right to conduct their corporation free from undue influence, deceit, and fraud, in violation of 18 U.S.C. § 1343.

Paragraph 14 describes the means by which the conspirators would carry out their plan, i. e., that the defendants Hughes, Davis and Maheu would represent that unless the Hughes Tool offer was accepted, the price of Air West stock would decline substantially; that the defendants and co-conspirators would manipulate and cause a decline in the market of Air West stock, and cause the Air West stockholders who sold their stock to receive artificially depressed prices;[1] and that the defendants Hughes, Davis and Maheu would cause telegrams to be sent to the directors of Air West threatening lawsuits if they did not change their votes. Paragraph 14 also lists ten overt acts committed in furtherance of the conspiracy, including three interstate conversations and an unspecified number of

---

1. The indictment does not list the stockholders who sold at the depressed prices.

interstate telegrams, all in violation of 18 U.S.C. § 371.

### Count II

The second count incorporates by reference the first ten paragraphs of Count I and alleges that the conduct described in Count I constituted violations of 15 U.S.C. §§ 78j(b), 78ff, 18 U.S.C. § 2 and Rule 10b–5, in that the defendants wilfully and knowingly employed a scheme to defraud, made untrue statements of material facts and omitted material facts necessary to make the statements made not misleading, and used instruments of interstate commerce to accomplish their scheme by placing a telephone call on December 31, 1968 to carry out their plan, all of which operated as a fraud and deceit upon purchasers and sellers of Air West stock.

### Counts III and IV

Count III alleges that for the purpose of executing the scheme to defraud described in Count I, the defendants caused to be transmitted in interstate commerce telephone conversations between Charnay in Las Vegas, Nevada, and a securities salesman in New York City, and Count IV alleges telephone conversations between a brokerage firm in Las Vegas and the AMEX in New York City, all in violation of the wire fraud statute, 18 U.S.C. § 1343 and § 2, aiding and abetting.

### Order Dismissing Indictment

In its order dismissing the indictment the district court noted that "the gravamen of the Indictment is that unlawful means were employed by agreement as part of the conspiracy to accomplish the ultimate objective . . ." of acquiring the assets of Air West, an obviously lawful purpose. The court recognized that "the conduct alleged, if true, is . . . reprehensible and an abuse of the power of great wealth" but felt forced to conclude that the indictment had not properly alleged a public offense. In reaching this conclusion the order reviewed each of the statutes alleged to have been violated in the various counts of the indictment.

Discussing 15 U.S.C. § 78j(b), which makes it illegal to use a manipulative or deceptive device in contravention of the SEC rules, the court considered the several 10b rules promulgated under the statute to determine whether the conduct described in the indictment could be said to be within their prohibitions. The court characterized Rule 10b–1 as the "basic section of the regulation", which it noted incorporates 15 U.S.C. § 78i(a), making illegal manipulation "for the purpose of inducing the purchase or sale of . . . securit(ies) by others." The court concluded that the indictment did not properly allege a § 78i(a)(2) violation (and thereby a Rule 10b–1 violation) since there was no allegation of a purpose to induce the purchase or sale of securities.[2]

---

**2.** 15 U.S.C. § 78i(a) provides in pertinent part:

"(a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

"\* \* \*

"(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

SEC Rule 10b–1, 17 C.F.R. § 240.10b–1 states:

"The term 'manipulative or deceptive device or contrivance,' as used in section 10(b) (48 Stat. 891; 15 U.S.C. 78j(b)), is hereby defined to include any act or omission to act with respect to any security exempted from the operation of section 12(a) 48 Stat. 892; 15 U.S.C. 78l(a)) pursuant to any section in this part which specifically provides that this section shall be applicable to such security, if such act or omission to act would have been unlawful under section 9(a) (48 Stat. 889; 15 U.S.C. 78i(a)), or any rule or regulation heretofore or hereafter prescribed thereunder, if done or omitted to be done with respect to a security registered on a national securities exchange, and the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange to use or employ any such device or contrivance in connection with the purchase or sale of any such security is hereby prohibited."

The court found other 10b rules defined more specific manipulative activities, none of which described the defendants, alleged conduct.[3] The court noted that Rule 10b–5 "is basically the antifraud provision of the regulations. It does not purport to define manipulative activity". A review of the regulations led the court to conclude:

"Nowhere in the regulations has the commission said that it is an unlawful manipulative or deceptive device to cause substantial blocks of a security to be sold on a national securities exchange for the purpose of artificially depressing the market price of the security and to secretly guarantee to sellers a profit or favorable return from the sales. That, in essence, is what this Indictment charges."

Noting the Government's concession that unless the alleged conduct was proscribed by the securities law, the other statutory violations could not stand,[4] the district court held that the Government had not met its burden to properly allege the defendants' criminal misconduct in any of the counts of the indictment.

### Contentions of Parties

In contending that the indictment alleges a violation of, and conspiracy to violate, Rule 10b–5 under 15 U.S.C. § 78j(b), and the wire fraud statute, 18 U.S.C. § 1343, the Government argues that (1) "a manipulation of the market which interferes with the free and open interplay of supply and demand constitutes fraud within the meaning of both Rule 10b–5 and the wire fraud statute"; and (2) the allegations in the indictment of a market manipulation were sufficient to charge an offense.

Appellees contend that the district court properly dismissed the indictment for failure to state an offense under either Rule 10b–5 or § 1343 because the "indictment does not allege facts which show any false statement or half-truth, any failure to disclose anything to anyone, any facts essential to a charge of manipulation, or any intent to deceive anyone, and the indictment does not otherwise allege facts which show how or in what manner conduct which is lawful in itself was false or fraudulent or intended to be so."[5] Appellees contend further that the indictment shows on its face that the conduct occurred beyond the five-year statute of limitations prescribed by 18 U.S.C. § 3282 and fails to plead facts which invoke 18 U.S.C. § 3288, which provides for reindictment within six months after an indictment has been dismissed.

### Rule 10b–5 and Market Manipulation

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides that it is:

"unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or any facility of any national securities exchange . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may pre-

---

**3.** The court noted that Rule 10b–4 proscribes the short tendering of a security by a non-owner, Rule 10b–6 proscribes fraudulent trading activities by an issuer or underwriter, and Rule 10b–7 makes illegal bidding to peg or manipulate the market. The court found, and we agree, that none of the activities alleged to have been committed by appellees come within the conduct forbidden by these rules.

**4.** The Government admits that its counsel made this concession, but contends that it was erroneous and "ignored the practice of the Government to prosecute manipulative conduct even prior to enactment of the Federal securi-

ties laws and regardless of whether a securities violation is charged", (opening Brief, p. 14, n. 3).

**5.** As noted *supra*, the district court held in effect that Rule 10–b and the wire fraud statute proscribing fraudulent conduct did not purport to include manipulative or deceptive activity. On this appeal the appellees "do not contend that a manipulation cannot be a fraud or a part of a fraud" but contend that the indictment fails to allege facts which "state a crime of manipulation or fraud". (Appellees' Brief, p. 4).

scribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5, 17 C.F.R. § 240.10b–5, adopted by the SEC in 1942, states:

"Employment of manipulative and deceptive devices. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

In the first Supreme Court decision involving Rule 10b–5 and 15 U.S.C. § 78j(b), *SEC v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Court observed that "§ 10(b) and Rule 10b–5 may well be the most litigated provisions in the federal securities laws . .". 390 U.S. at 465. The Court concluded that "Section 10(b) and Rule 10b–5 together constitute one of the several broad antifraud provisions contained in the securities laws".[6] Id. at 466, 89 S.Ct. at 572, 21 L.Ed.2d at 680. Unfortunately for purposes of this case, there has been very little litigation concerning the application of the Rule to market manipulations in corporate takeovers, and

no cases at all involving the specific conduct in which the appellees are alleged to have engaged. We therefore turn to the legislative, administrative and judicial history of the Securities Exchange Act and Rule 10b–5 in determining whether the appellees' alleged conduct, if true, constitutes an indictable offense.[7]

In Section 2 of the Securities Exchange Act, 15 U.S.C. § 78b, Congress explained that one of its primary objectives in formulating the Act was "to insure the maintenance of fair and honest markets" in transactions conducted on the securities exchanges. The House Report on the Act, H.R.Rep. No. 1383, 73d Cong., 2d Sess., p. 10 (1934) gives further evidence of Congress' concern:

"To insure to the multitude of investors the maintenance of fair and honest markets, manipulative practices of all kinds on national exchanges are banned. The bill seeks to give investors markets where prices may be established by the free and honest balancing of investment demand with investment supply."[8]

Senate Report No. 1455, 73d Cong., 2d Sess., p. 81 (1934), similarly states:

"The purpose of the Act is . . . to purge the securities exchanges of those practices which have prevented them from fulfilling their primary function of furnishing open markets for securities where supply and demand may freely meet at prices uninfluenced by manipulation or control."

The language of the section and its legislative history leave little doubt that Congress intended § 78j(b) to operate, after rule making by the SEC, as a broad prohibi-

---

**6.** The Court held that in light of the broad antifraud purposes of Section and Rule, which "[apply] in connection with the purchase or sale of any security", exchanges by shareholders of a corporation of their old stock for shares in a new company were "purchases" within the meaning of the statutory language. 393 U.S. 466–468, 89 S.Ct. 572, 21 L.Ed.2d 680.

**7.** For the purposes of ascertaining the validity of an indictment the facts alleged by the Government are assumed to be true. *United*

*States v. Howard*, 352 U.S. 212, 214–215, 77 S.Ct. 303, 304–305, 1 L.Ed.2d 261, 263 (1957).

**8.** The same report also states on p. 11 that:

"The idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of the security brings about a situation where the market price reflects as nearly as possible a just price."

tion against deceptive devices.[9] This manifestation of Congressional intent was recognized in *Supt. of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128, 134 (1971), where the Court quoting from H.R.Rep. No. 1383, 73d Cong., 2d Sess., 7, said in part: "Since practices 'constantly vary and where practices legitimate for some purposes may be turned to illegitimate and fraudulent means, broad discretionary powers' in the regulatory agency 'have been found practically essential.' . . . Section 10(b) must be read flexibly, not technically and restrictively". In light of this background it is not surprising that the broad language of Rule 10b–5 has been applied by the courts and the SEC as the principal Rule under § 78j(b) for prohibiting the multitude of deceptive and manipulative devices which continually appear in the securities markets, including activities directed, as the conduct of the appellees is alleged to have been designed, toward the manipulation of securities prices for personal gain.

█ The utilization of Rule 10b–5 to reach a wide range of deceitful securities trading practices was given impetus by early cases holding that the Act and the Rule provide an implied right of private action in favor of an injured party to enforce the Rule's sanctions. See, *e. g., Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D.Pa. 1946). This principle was affirmed by the Supreme Court in *Bankers Life & Cas. Co., supra*, 404 U.S. at 10, 92 S.Ct. at 167, 30 L.Ed.2d at 132. Much of the case law on Rule 10b–5 has, therefore, developed in civil rather than criminal litigation. In *SEC v. Joiner Corp.*, 320 U.S. 344, 355, 64 S.Ct. 121, 125, 88 L.Ed. 88, 95 (1943), the Court indicated that the primary difference between criminal and civil prosecutions under the securities laws is the burden of proof required for a verdict. As noted in *United States v. Clark*, 359 F.Supp. 128, 130 (S.D.N.Y.1973), "there is no reasonable basis for

holding that some different interpretation [of Rule 10b–5] should apply to a criminal action" than in a civil action. We agree that precedents established in civil cases interpreting Rule 10b–5 are applicable in criminal prosecutions under the Rule, as here.

Civil cases holding manipulative and deceitful devices violative of § 78j(b) and Rule 10b–5 include *Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540, 546–547 (2 Cir. 1967), where the court found that the statute and rule made unlawful a majority stockholder scheme to reduce dividends in order to force down the market price of stock and cause minority shareholders to sell out at depressed values. In reaching its conclusion the court observed that "[d]eceitful manipulation of the market price of publicly-owned stock is precisely one of the types of injury to investors at which the Act and Rule were aimed". 384 F.2d at 547. In *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 792–798 (2 Cir. 1969), the court was presented with a factual situation somewhat resembling the case before us. The court held that Rule 10b–5 was violated by the scheme of one corporation seeking a merger and attempting to block a tender offer by another corporation in which it bought large blocks of shares of the target corporation in the open market, thus driving the market price up while at the same time financing these purchases by disposing of the newly acquired stock at a loss in secret and unreported sales. The court found that these activities operated as a deceit on those in the investing public who were misled by the trading activities as well as on the other corporation whose tender offer was blocked by the scheme. Recently in *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 378–381 (2 Cir. 1974), the court found a market manipulation in which one party to a corporate merger allegedly caused the market price of the oth-

9. Even before the enactment of the Securities Exchange Act market manipulations seeking to create artificial prices were considered to be unlawful and contrary to public policy. See, *e. g., Harper v. Crenshaw*, 65 App.D.C. 239, 82 F.2d 845 (1936) citing early English and American cases which held that contracts for the purpose of creating fictitious securities prices were unenforceable.

er corporation to increase in order to obtain a more favorable exchange ratio to be prohibited by the provisions of Rule 10b–5.

These cases are illustrative of the extent to which § 78j(b) and Rule 10b–5 have been applied to a broad range of manipulative practices.[10] As stated in *Herpich v. Wallace*, 430 F.2d 792, 801–802 (5 Cir. 1970):

"[T]he section [78j(b)] reflects the design of the Exchange Act as a means for preventing inequitable and unfair practices on securities exchanges and over-the-counter markets and for insuring fairness and honesty in securities transactions generally . . . Congress sought to protect persons 'who would be engaged in buying and selling and trading in * * * securities as broadly defined in the Act.' . . . It did not make section [78j(b)] self-executing, nor did it limit the section's application to the manipulative and deceptive devices or contrivances known in 1934. Instead, it wrote the section as a 'catchall' meant to reach practices employed in connection with the purchase or sale of securities which were contrary to the public interest or the interest of investors.

\* \* \* \* \* \*

"Together the section and the rule aim at reaching 'misleading or deceptive activities, whether or not they are precisely and technically sufficient to sustain a common law action for fraud and deceit,' . . . carried on 'in connection with' the purchase or sale of securities. They are not intended as a specification of particular acts or practices that constitute 'manipulative or deceptive devices or contrivances,' but are instead designed to encompass the infinite variety of devices that are alien to the 'climate of fair dealing,' . . ."[11]

Appellees argue that the cases applying Rule 10b–5 to market manipulations are distinguishable because the courts found either insiders with an affirmative duty to disclose due to their relationship with corporate management or defendants with a purpose to induce the purchase or sale of securities by deceit. While we recognize that none of the factual situations in the cases discussed *supra* are identical to that present here, we do not believe that the cases interpreting Rule 10b–5, or the Rule itself may be read as restrictively as appellees suggest. It is true that much of the Rule 10b–5 litigation dwells on the special duty of insiders to disclose information. However, the language of the Rule provides no basis for concluding that only "insiders" are subject to its requirements.[12] As noted in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 858–862 (2 Cir. 1968), *cert. denied sub nom. Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), the duty to disclose material information is based upon a poten-

10. The SEC has utilized Rule 10b–5 to halt market manipulations in cases which have not reached the courts. In *Delafield & Delafield*, CCH Fed.Sec.L.Rep. ¶ 77,648 (1968), for example, the Commission issued a consent order finding a broker in violation of Rule 10b–5 for his activities in manipulating stock prices downward in order to induce a shareholder to sell his substantial holdings at a reduced price to the broker's customers.

11. Recent cases concerning frauds in corporate take overs have concentrated on deceitful tender offers and have utilized § 78n(e), enacted by Congress in 1968, to deal specifically with such problems after some courts had found difficulty in finding standing for individual plaintiffs to bring actions under Rule 10b–5 in tender offer cases. See, *e. g.*, *Mutual Shares Corp. v. Genesco, Inc., supra*, 384 F.2d at 545. It is doubtful that the facts here come under § 78n(e), especially where the acts complained of commenced before the statute became effective. In a criminal prosecution, the standing problem is, of course, not present and Rule 10b–5 is applicable if the conduct charged falls within the Rule's prohibitions. We note, however, that Rule 10b–5 has been held to cover tender offer frauds despite the more specific provision of § 78n(e). See, *e. g.*, *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 589–595 (5 Cir. 1974); but see *contra*, *H. K. Porter Co., Inc. v. Nicholson File Co.*, 482 F.2d 421, 425 (1 Cir. 1973). See generally, Securities Exchange Act-Tender Offers, 6 A.L.R. Fed. 906 (1971).

12. 3 Loss, Securities Regulations 1445 (2d Ed. 1961) observes that "Rule 10b–5, like § 17(a) of the Securities Act, is not limited to corporate insiders—however that term may be defined. The rule may be invoked whenever any person, insider or outsider, indulges in fraudulent practices, misstatements or half-truths in connection with the purchase of securities."

tial manipulator's duty to the investing public as a whole as well as to particular shareholders. Moreover, it should be noted that clauses (a) and (c) of Rule 10b–5 are not aimed at failures to disclose. Rather they are flat prohibitions of deceitful practices and market manipulations.

Concerning the necessity of alleging and proving a purpose to induce others to trade in securities under Rule 10b–5, there is simply no requirement under the Rule, as there is under § 78i(a), for such pleading or proof. Neither § 78j(b) nor the Rule make any reference to a specific intent to induce trading by others.

■ As the court noted in *Landy v. F.D. I.C.*, 486 F.2d 139, 161 (3 Cir. 1973), "A scheme deliberately calculated to manipulate the market value of a stock would be covered under the rule." Here the Government has alleged that the appellees in selling their Air West stock purposely sought to depress the market for the stock, and in fact achieved this result, with the object and effect of deceiving the shareholders and directors of Air West in Hughes' takeover attempt. Such conduct falls within the type of activity which Congress sought to prohibit in enacting the Securities Act and which Rule 10b–5 explicitly prohibits. It constitutes an indictable offense.

### Validity of the Indictment

Appellees contend that even if the conduct in which they are alleged to have engaged is proscribed by the securities laws, the indictment must nevertheless fail due to numerous fatal defects in pleading. We turn now to appellees' specific challenges to the various counts.

### Count I

■ The first count of the indictment charged the appellees with conspiring to violate the securities laws, specifically Rule 10b–5, and the wire fraud statute, 18 U.S.C. § 1343. Under 18 U.S.C. § 371, the conspiracy statute which is the basis for Count I, it is necessary to allege those three elements which are said to be the gist of the offense: the agreement, the unlawful object towards which the agreement is directed, and an overt act in furtherance of the conspiracy. *United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 206, 85 L.Ed. 128, 132 (1940); *United States v. Offutt*, 75 U.S.App.D.C. 344, 127 F.2d 336, 338 (1942); *United States v. Wilson*, 356 F.Supp. 463, 464 (D.Md.1973). Count I meets these requirements. It is alleged that appellees and their unindicted co-conspirators agreed to a scheme whereby they would coerce and defraud the directors and shareholders of Air West; that the object of the conspiracy was in violation of both the securities laws and the wire fraud law; and that the appellees and their co-conspirators undertook ten overt acts in furtherance of their scheme. It is apparently appellees' position, however, that any defect in Count I occurs not in failing to properly allege a conspiracy, but in the underlying assumption that the substantive offenses charged in the remaining counts of the indictment are in fact illegal. We believe that Count I is adequate to charge a conspiracy and, as explained below, the substantive counts, upon which Count I is based, are sufficient to state an offense.

### Count II

Appellees direct their attack primarily at Count II, which alleges that the conduct described in Count I violated the securities laws and the aiding and abetting statute. They contend that the count fails because it (1) does not allege that "stock was sold [by appellees] for the purpose of inducing the sale of such stock by others and in a deceitful manner designed to achieve such a purpose";[13] (2) fails to allege any failure by the appellees to disclose material facts; and (3) does not allege that appellees acted with an intent to defraud.

■ With respect to the argument that a market manipulation charged under Rule 10b–5 requires an allegation of the defendants' purpose to induce the sale of securities by others, as noted *supra*, we find nothing in the language of either § 78j(b), § 78ff, or

**13.** Appellees' brief, p. 13.

Rule 10b–5 which implies this requirement. Had the Government charged appellees under § 78i(a) an allegation of a purpose to induce would have been essential. However, § 78i(a) is not a basis for any of the charges here and cannot be read as a limitation on Rule 10b–5. The legislative and judicial history of § 78j(b) make it clear that the statute and rules promulgated thereunder are to operate independently of other securities laws provisions.[14] As the court noted in *Texas Gulf Sulphur*, 401 F.2d at 859, "from its very inception, Section 10(b) [§ 78j(b)], and the proposed sections . . . from which it was derived, have always been acknowledged as catchalls" for manipulative activities which the SEC finds detrimental to the interests of investors and which are not covered by other provisions of the securities laws. Had Congress or the SEC intended that a specific purpose to induce others to trade was a requirement under § 78j(b), this requirement would have been specified, as it was in § 78i(a).[15]

■ Appellees' argument that Count II must fail because it does not allege any omission by appellees to disclose material facts we reject for two reasons: First, Rule 10b–5 prohibits manipulative activities *per se* and not only those activities resembling common law fraud. As we note above, clauses (a) and (c) of the Rule make no

reference to a requirement that defendants charged under the rule must fail to disclose material facts for their conduct to be proscribed. That conduct is covered by clause (b). Second, our reading of Counts I and II persuade us that the indictment does adequately allege material misrepresentations and omissions. The description of appellees' activities in representing to Air West stockholders and directors that the market would decline if the Hughes tender offer were rejected and their subsequent conduct in driving down the market price without revealing that the decline was not due to the free operation of market forces constitutes a sufficient allegation of a misrepresentation and omission.[16] As the court observed in *O'Neill v. Maytag*, 339 F.2d 764, 768 (2 Cir. 1964) (quoted with approval in *Mutual Shares Corp. v. Genesco, Inc., supra*, 384 F.2d at 546), "deception may take the place of nonverbal acts."[17] Failure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact.

■ Nor do we find merit in appellees' contention that the indictment is fatally defective because it fails to allege specific intent to defraud. In construing §§ 78j(b) and 78ff in *United States v. Pelz*, 433 F.2d 48, 54 (2 Cir. 1970), Judge Friendly says in

**14.** Appellees' argument implies that § 78i(a) rather than Rule 10b–5 is the section under which market manipulations should be charged. The language of Rule 10b–5 and its history, however, undercut the validity of this argument.

**15.** Appellees, quoting from a 1941 opinion of the Commission's General Counsel, 2 CCH Fed. Sec.L.Rep. ¶ 22,565, point out that the SEC has indicated that the Exchange Act does not prohibit trading activity which may advance or depress the market. It may be noted first that this opinion was issued before the adoption of Rule 10b–5. In any event, the appellees are not charged with trading activities which had the effect of changing market prices (as might any large scale transactions). Rather, appellees are charged with deliberately depressing market prices—a different matter entirely from incidentally depressing prices through trading activities.

**16.** The indictment states in Count I, para. 14:

"(a) Defendants Howard R. Hughes, Chester C. Davis, and Robert A. Maheu would represent to stockholders of Air West and others that if the Hughes Tool proposal was not accepted by Air West, the price of the common stock of Air West would decline substantially,

"(b) Defendants Howard R. Hughes, Chester C. Davis, Robert A. Maheu, and David B. Charnay, aided by co-conspirators Greenspun and Crockett, would manipulate and cause a decline in the market price of Air West common stock on the AMEX in the following manner: . . . ."

**17.** The court continued: "And it need not be deception in any restricted common law sense; one of the central purposes of federal securities legislation would otherwise be seriously vitiated". The court recognized, however, that "there must be allegation of facts amounting to deception in one form or another; conclusory allegations of deception or fraud will not suffice". 339 F.2d at 768.

part: "The language makes one point entirely clear. A person can willfully violate an SEC rule even if he does not know of its existence. This conclusion follows from the difference between the standard for violation of the statute or a rule or regulation, to wit, 'willfully,' and that for false or misleading statements, namely 'willfully and knowingly'." In considering "what mental state" must be proved Judge Friendly refers to an article by Judge Herlands in 21 Va.L.Rev., and continues at 433 F.2d at 55:

> "The Herlands article concluded it was necessary only that 'the prosecution establishes a realization on the defendant's part that he was doing a wrongful act,' 21 Va.L.Rev. at 149. We accept this with the qualifications, doubtless intended by the author, that the act be wrongful under the securities laws and that the knowingly wrongful act involve a significant risk of effecting the violation that has occurred."[18]

The indictment was sufficient to meet these tests. It alleges a knowing participation by all of the defendants in the perpetration of the manipulation which created the artificially depressed market price and consequent fraud and deceit. It was sufficient to allege a violation of § 78j(b) and Rule 10–b.[19]

*Counts III and IV*

 With respect to Counts III and IV charging violation of the wire fraud

statute, 18 U.S.C. § 1343,[20] appellees contend that the Government has failed to allege adequate facts to show the nature of the fraud and how it was to be accomplished. We agree with the general principle relied on by appellees that an indictment under the wire fraud statute must "set out clearly what the artifice was wherein the fraud consisted, and how it was to be accomplished". *Etheredge v. United States*, 186 F. 434, 437 (5 Cir. 1911). We conclude, however, that the facts alleged in the indictment were sufficient to meet this requirement.

Count I, which is incorporated by reference into Counts III and IV, describes in some detail the operation of the allegedly manipulative scheme and its purpose. Counts III and IV state that the object of this activity was to defraud the shareholders and directors of Air West. Count I gives the approximate dates during which the scheme was in effect. Counts III and IV give the specific dates on which appellees are alleged to have used interstate wire facilities to accomplish their objective. The counts charging appellees with wire fraud appear to be sufficiently specific under the standards cited by appellees.

In *Hagner v. United States,* 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861, 865 (1932), the Supreme Court stated:

> "The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but

---

**18.** See also *United States v. Dardi*, 330 F.2d 316, 331 (2 Cir. 1964) and Securities Laws— Scienter, 20 A.L.R. Fed. 227 (1974). The ALR article notes one case, *United States v. Van de Carr*, 343 F.Supp. 993 (C.D.Cal.1972), which appears to reach a contrary result. The authority of *Van de Carr*, however, is questionable since it was concerned with violations of Federal Reserve Board regulations rather than SEC rules.

**19.** *United States v. Piepgrass*, 425 F.2d 194 (9 Cir. 1970) cited by appellees is distinguishable. It did not specifically consider the question presented in this case and involved a prosecution under 15 U.S.C. § 77q(a). The court did recognize that, "Intent to defraud may be inferred from one's knowledge that the scheme operated in a deceitful manner", but held that

"the latter knowledge must be possessed by each individual". 425 F.2d at 199. It was so alleged in this case.

**20.** § 1343 provides in pertinent part:

"Fraud by wire, radio, or television Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate . . . commerce, any writings, signs, signals, . . . or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' [citations omitted]" [21]

We conclude that each count of the indictment meets this test. If the defendants desire more definite information, they may obtain it through a bill of particulars.

### Statute of Limitations

18 U.S.C. § 3282 provides that no person shall be prosecuted for any offense, not capital, "unless the indictment is found or the information is instituted within five years next after such offense shall have been committed". The first indictment against appellees was returned on December 27, 1973, within five years after December 31, 1968, the final date of the manipulation alleged in the indictment. The first indictment was dismissed on January 30, 1974, and the second indictment was returned on July 30, 1974, after the five year period had elapsed. Obviously the action would be barred, except for 18 U.S.C. § 3288, which provides that "a new indictment may be returned . . . within six calendar months of the date of the dismissal of the indictment or information . . ." [22]

Appellees contend, however, that § 3288 is inapplicable for four reasons: (1) the second indictment attempts to charge different offenses than those charged in the first, in contravention to judicial interpretations of § 3288; (2) § 3288 cannot apply to the conspiracy count of the first indictment because that count was dismissed before the statute of limitations had run and not after the period, as provided in § 3288; (3) the second indictment must recite the existence and dismissal of the first indictment for "jurisdictional" purposes; and (4) § 3288 applies only where the dismissal of the original indictment was defective due to some grand jury defect or irregularity and not where the indictment is dismissed for failure to state an offense.

Section 3288 in its present form was enacted in 1964. Prior thereto a very similar statute, passed in 1934, was in effect. [23] In *United States v. Durkee Famous Foods,* 306 U.S. 68, 71, 59 S.Ct. 456, 458, 83 L.Ed. 492, 495 (1939), the Supreme Court found that Congressional intent concerning the section was best summarized by the following letter written by the United States Attorney General:

> " . . . legislation is recommended providing that in any case in which an indictment is found defective or insufficient for any cause, after the period prescribed by the statute of limitations has run . . . a new indictment may be returned at any time during the first succeeding term of court at which a grand jury is in session."

Congress's primary purpose in changing the language of the statute in 1964 was to correct a "loophole" in the law which oc-

---

**21.** Accord, *United States v. Debrow,* 346 U.S. 374, 376, 74 S.Ct. 113, 114, 98 L.Ed. 92, 96 (1953).

**22.** 18 U.S.C. § 3288 reads:

"Whenever an indictment is dismissed for any error, defect, or irregularity with respect to the grand jury, or an indictment or information filed after the defendant waives in open court prosecution by indictment is found otherwise defective or insufficient for any cause, after the period prescribed by the applicable statute of limitations has expired, a new indictment may be returned in the appropriate jurisdiction within six calendar months of the date of the dismissal of the indictment or information, or, if no regular grand jury is in session in the appropriate jurisdiction when the indictment or information is dismissed, within six calendar months of the date when the next regular grand jury is convened, which new indictment shall not be barred by any statute of limitations."

**23.** This statute, 18 U.S.C. § 587, reads:

"Whenever an indictment is found defective or insufficient for any cause, after the period prescribed by the applicable statute of limitations has expired, a new indictment may be returned at any time during the next succeeding term of court following such finding, during which a grand jury thereof shall be in session."

curred when it became possible to charge by information as well as indictment. As Senate Report No. 1414, 2 U.S.Code Cong. and Admin.News pp. 3257–3258 (1964) explained:

"The purpose of the proposed legislation is to amend sections 3288 and 3289 of title 18, United States Code, so as to provide that the provisions of those sections will extend to felony proceedings instituted by information as well as by indictment. The sections concern cases where a new indictment is returned after a prior indictment has been dismissed, because of an error, defect, or irregularity with respect to the grand jury, or because it has been found otherwise defective. The amendments would therefore permit reindictment in similar cases where an information was filed after the defendant waived in open court prosecution by indictment."

There is nothing in the legislative history of § 3288 to indicate that Congress had any intention of otherwise altering the meaning or application of the section. Applying this legislative history and the judicial interpretations of the pre-1964 version of the statute we conclude that appellees' contentions must be rejected.

■ Concerning appellees' contention that the second indictment should be dismissed because it charges different offenses, we find nothing in the cases cited by appellees or the language of § 3288 to require this conclusion. The correct interpretation of § 3288 was stated by this court in *Mende v. United States,* 282 F.2d 881, 883–884 (9 Cir. 1960): "[the] underlying concept of § 3288 is that if the defendant was indicted within time, then approximately the same facts may be used for the basis of any new indictment within the next term, if the earlier indictment runs into legal pitfalls." Here, a reading of the two indictments shows that essentially the same facts were used to charge almost identical offenses. The indictments differ primarily in

the omission in the second indictment of the charge that 18 U.S.C. § 78i(a) was also violated by appellees' activities. Allowing a second indictment to remedy legal deficiencies present in the first is the very purpose for which § 3288 was enacted.

■ Under § 3288 the dismissal of the first indictment must occur "after the period prescribed by the applicable statute of limitations has expired". Appellees argue that § 3288 cannot be applied to the conspiracy count because the statute of limitations had not run on that count until April, 1974 while the dismissal occurred on January 30, 1974—*before* the statute had run. This argument appears to be based on a misunderstanding of the prevailing rule used in computing periods of limitation in conspiracy cases. As this court stated in *Bergschneider v. Denver,* 446 F.2d 569 (1971), "[the] statute of limitations starts to run on the date of the last overt act alleged to have caused the complainant injury". The last overt act alleged in the first indictment was alleged to have occurred on December 31, 1968—almost a month before the first indictment was dismissed.[24]

■ Appellees next contend that the second indictment should have contained an allegation with respect to the first indictment and its disposition. We find no support for this argument in the cases cited by appellees. While it is true that criminal statutes of limitation have been characterized as jurisdictional (*Walters v. United States,* 328 F.2d 739, 743 (10 Cir. 1964)), nothing would be gained by requiring a second indictment to allege the dispositional history of the first. The fact that the first indictment was dismissed is part of the record of the case before the court. As was recognized in *Sanseverino v. United States,* 321 F.2d 714, 715 (10 Cir. 1963), "The government had no burden to offer formal proof of that which appears in the case record of the court for such is the cornerstone of judicial notice . . . ."[25] Simi-

24. In any case, 18 U.S.C. § 3289 provides that a new indictment may be returned within six calendar months where the defect is found *before* the expiration of the period of limitations.

25. In *Sanseverino,* an indictment filed May 17, 1962 charged the filing of a false return on April 9, 1956. The Government offered no formal proof that the six-year statute of limita-

larly, we see no need to plead information which is obviously a part of the case record.

In their final challenge to the applicability· of § 3288, appellees cite two district court cases, *United States v. Moriarty,* 327 F.Supp. 1045, 1047–1048 (E.D.Wis.1971), and *United States v. Distefano,* 347 F.Supp. 442, 444–445 (S.D.N.Y.1972), holding that where an indictment is dismissed for failure to prosecute, reindictment is not possible once the statute of limitations expires. In each case the court recognized that when an indictment is dismissed because of technical defects or irregularity in the grand jury, a new indictment may be returned. In neither case did the court consider the precise situation here presented, i. e., where the court found the first indictment legally defective.

While the first clause of § 3288 appears to be aimed at dismissal resulting from irregularities in the grand jury, the second clause is much more general. It states that a new indictment or information may be refiled where the second *"indictment* or information filed after the defendant waives in open court prosecution by indictment *is found* otherwise *defective or insufficient for any cause."* The same language (in italics), absent the words inserted in the 1964 amendment providing for proceedings commenced by information (in regular face type), was interpreted in *United States v. Main,* 28 F.Supp. 550 (S.D.Tex.1939). There the court rejected an argument identical to that raised by appellees. Quoting from *United States v. Strewl,* 99 F.2d 474, 476 (2 Cir. 1938), the court observed that the purpose of the statute was "to prevent the escape of those who had been seasonably indicted,·but whose indictment was bad because of some corrigible mistake." 28 F.Supp. at 553.

 *Main* and the dicta from *Strewl* were the prevailing law for almost thirty years until the 1964 amendment to § 3288.

As noted previously, the purpose of Congress in modifying the statute was to expand its provisions to cover proceedings initiated by informations and not to change existing law in any other manner. We conclude from the language of § 3288, as well as from the section's history, that a second indictment may properly be returned within the prescribed six-months period where the dismissal of the first indictment is due to a legal defect, as well as in those cases where the dismissal results from defects or irregularities in the grand jury.

*Conclusion*

In summary, we conclude that (1) the market manipulation artificially depressing the market price of a security on a national securities exchange was an indictable offense under 15 U.S.C. 78j(b) and SEC Rule 10–b; (2) while the indictment was by no means a model pleading it was sufficient to charge the elements of the offense, and further information may be obtained through a bill of particulars; and (3) the statute of limitations prescribed by 18 U.S.C. § 3282 was tolled by the provisions of § 3288.

Reversed and remanded for further proceedings consistent with this opinion.

SNEED, Circuit Judge (concurring):

I concur in Judge Jameson's opinion which is written with his usual clarity and thoroughness. The law, as I read it, supports his conclusions.

However, I cannot let pass this opportunity to draw attention to the fact that so-called "public welfare offenses"[1] do not generally, and clearly not in this case, encounter the same demanding constitutional and interpretive standards applicable to other criminal offenses.

As Judge Jameson's opinion makes clear, neither section 10(b) of the Securities Ex-

---

tions had been tolled, but the court records showed that a complaint had been filed on March 30, 1962.

1. *See Morrissette v. United States,* 342 U.S. 246, 255, 72 S.Ct. 240, 245, 96 L.Ed. 288, 296 (1951); Sayre, *Public Welfare Offenses,* 33 Col. L.Rev. 55 (1933).

change Act, 15 U.S.C. § 78j(b), nor Rule 10b–5, 17 C.F.R. § 240.10b–5, are interpreted narrowly when employed as a basis for criminal prosecution, even though a narrow interpretation is ordinarily considered proper with respect to statutes defining crimes. *United States v. Campos-Serrano*, 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457, 461 (1971); *United States v. Braverman*, 373 U.S. 405, 408, 83 S.Ct. 1370, 1372, 10 L.Ed.2d 444, 447 (1963). In this case, for example, we find an indictable offense charged in the indictment despite the fact that there exists no case, not even one imposing civil liability, in which substantially similar facts have been treated as a violation of section 10(b) and Rule 10b–5. These provisions have been applied herein to the conduct of the defendants no differently than they would have been in a civil action. The expansive interpretation necessary "to insure the maintenance of fair and honest exchanges," section 2 of the Securities Exchange Act, 15 U.S.C. § 78b, employed in civil actions is employed by us in this criminal case. Majority opinion, *supra* at 10–11. This is done even though Professor Bromberg cites only eight cases in which violations of section 10(b) and Rule 10b–5 have served as the basis of criminal prosecution. 3 A. Bromberg, Securities Law: Fraud, § 10.3 at 241 (1975). Professor Loss cites only a handful more. 3 Loss, Securities Regulation, at 1449 n.15 (1961). Also it is done even though the Supreme Court, speaking through Mr. Justice Rehnquist, recently observed:

> "When we deal with private actions under Rule 10b–5 we deal with a judicial oak which has grown from little more than a legislative acorn. Such growth may be quite consistent with the congressional enactment and with the role of the federal judiciary in interpreting it, see *J. I. Case v. Borak, supra,* but it would be disingenuous to suggest that either Congress in 1934 or the Securities and Exchange Commission in 1942 foreordained the present state of the law with respect

to Rule 10b–5." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539, 550 (1975).

"Employment of manipulative and devious devices" has a breadth, we assert, which permits us to find an indictable offense when it is necessary to do so "to insure the maintenance of fair and honest markets." The resemblance from an analytic viewpoint between our approach and that employed in *Shaw v. Director of Public Prosecutions,* 2 A.E.R. 452 (1961), where the House of Lords recognized that the common law crime of corrupting public morals requires a residual power to proscribe unanticipated wickedness *contra bonos mores,* strikes me as disturbingly close.[2] To protect and preserve honest markets we assert the residual power derived from a broad statute and rule to proscribe conduct surrounding a corporate takeover never heretofore branded improper by judicial decision, Commission rule or determination, or explicit Congressional act. And yet I am convinced that our assertion of this authority is in keeping with existing law.

The concern to avoid the taint of *ex post facto* application of a statute, a concern evidenced by the Supreme Court in *Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), where the Court refused to permit the application of a new and unusual interpretation of a state criminal statute to conduct taking place prior to the new interpretation, only feebly survives in the area of section 10(b) criminal prosecution. In this case, we are untroubled by the fact that never before has the section and rule been applied to a similar situation. Furthermore, in fixing criminal liability under section 10(b) and Rule 10b–5, we attach reduced importance to assertions of vagueness. The fact that men of common intelligence—or lawyers and judges for that matter—"must necessarily guess at its meaning and differ as to its

---

2. Hart, Law, Liberty, and Morality (1963) contains a discussion of *Shaw* and related problems.

application," [3] does not require that we declare this section 10(b) void for vagueness. *Cf. Coplin v. United States,* 88 F.2d 652 (9th Cir. 1937), *cert. denied,* 301 U.S. 703, 57 S.Ct. 929, 81 L.Ed. 1357 (1937) (very similar language of section 17(a) of the Securities Act of 1933 held not vague); *Hughes v. SEC,* 139 F.2d 434 (2d Cir. 1943) (section 17(a) not vague). We heed not the command:

"No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids."

*Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888, 890 (1939).

Rather we respond to stern and demanding fatalism reflected in this passage appearing in *Nash v. United States,* 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232, 1235 (1913):

"[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment . . . ; he may incur the penalty of death."

Finally, all these things we do while fully aware that under section 32(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78ff(a), the intent necessary to support a conviction is merely that of intending to do the acts prohibited, rather than intent to violate the statute. *United States v. Schwartz,* 464 F.2d 499, 509 (2d Cir. 1972). Proof of an "evil motive" appears unnecessary. *Id.* at 510, *citing* Loss, Securities Regulation. Moreover, it has been held that to avoid imprisonment on the ground of "no knowledge of such rule or regulation" requires more than the defendant merely asserting that he did not know that his manipulative activity was fraudulent under Rule 10b–5. *See United States v. Lilley,* 291 F.Supp. 989 (S.D.Tex.1968). The

propriety of eliminating *scienter* or *mens rea* in statutes designed to serve a regulatory purpose has again been recognized by the Supreme Court in a recent decision. *See United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975).

An expansive statute under which the prosecution encounters such reduced obstacles imposes a heavy responsibility upon the prosecutor. Many are his potential targets and few are the standards by which the exercise of his discretion can be measured. *See Grayned v. City of Rockford,* 408 U.S. 104, 108–9, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222, 227–228 (1972). His decision to prosecute, no less than his failure to prosecute, may subject him to legitimate criticism. Whatever his decision, it is likely to be one in keeping with the political realities within which he functions. This is a part of the price that this type of statute compels us to pay.

Thus, although I have no choice but to join my brothers, I find no satisfaction or pleasure in doing so.

## ON PETITION FOR REHEARING

Appellees Charnay, Davis and Maheu have petitioned for a rehearing, contending, *inter alia,* that the decision of this court entered May 7, 1976, is in direct conflict with the decision of the Supreme Court in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, entered March 30, 1976. Prior to filing its opinion this court considered the effect of *Ernst & Ernst* and concluded that our opinion was not in conflict with the holding in that case. After re-examination of the opinion in *Ernst & Ernst* in the light of the petition for rehearing, we reach the same result, but deem it advisable to enter this supplemental order explaining and clarifying the reasons for our conclusion.

*Ernst & Ernst v. Hochfelder* was a civil action for damages for alleged negligent conduct. The issues before the Court and

---

3. *See Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926).

its conclusions are summarized in the following excerpts from the Court's opinion:

"We granted certiorari to resolve the question whether a private cause of action for damages will lie under § 10(b) and Rule 10b–5 in the absence of any allegation of 'scienter'—intent to deceive, manipulate, or defraud. 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 773 (1975). We conclude that it will not and therefore we reverse. [96 S.Ct. 1381]

. . . . .

"Use of the word 'manipulative' is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities. [96 S.Ct. 1384]

. . . . .

"When a statute speaks so specifically in terms of manipulation and deception, and of implementing devices and contrivances—the commonly understood terminology of intentional wrongdoing—and when its history reflects no more expansive intent, we are quite unwilling to extend the scope of the statute to negligent conduct.

Recognizing that § 10(b) and Rule 10b–5 might be held to require proof of more than negligent nonfeasance by Ernst & Ernst as a precondition to the imposition of civil liability, respondents further contend that the case should be remanded for trial under whatever standard is adopted. Throughout the lengthy history of this case respondents have proceeded on a theory of liability premised on negligence, specifically disclaiming that Ernst & Ernst had engaged in fraud or intentional misconduct. In these circumstances, we think it inappropriate to remand the action for further proceedings." [96 S.Ct. 1391]

This case obviously involves more than negligent conduct. Appellees argue, however, that in holding that the indictment was not fatally defective by reason of its purported failure to allege a specific intent to defraud our decision is contrary to the holding in *Ernst & Ernst*. Appellees misconstrue the basis of our disposition of this issue.

Although we did state that the cases have held that there is no requirement of proof that a defendant knew he was violating a particular S.E.C. rule, we did not hold that scienter *per se* was not a required element of the offense. Rather we noted that it was necessary for the prosecution to show an intentional act with "a realization on the defendant's part that he was doing a wrongful act." Similarly, Judge Sneed in his concurring opinion noted that "the intent necessary . . . is merely that of intending to do the acts prohibited, rather than intent to violate the statute." These statements are consistent with the holding in *Ernst & Ernst*.

Specific allegations in the indictment charging the requisite mental state and scienter include the following:

Count II charges that the defendants and their co-conspirators "did unlawfully, wilfully and knowingly, in connection with the purchase and sale of securities, to wit, the common stock of Air West, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and the mails and the facilities of a national securities exchange, (a) employ a device, scheme, and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engage in acts, practices and courses of business which operated as a fraud and deceit upon purchasers and sellers of Air West securities."

Count III charges that the defendants and their co-conspirators "did devise and intend to devise a scheme and artifice to defraud the directors and stockholders of Air West, which said scheme and artifice to defraud is set forth more fully in paragraphs 13 and 14a through 14e of Count I of this indictment."

Paragraph 13 of Count I describes the means by which the conspiracy would be carried out. Paragraph 14 lists overt acts committed in furtherance of the conspiracy.

We conclude that these and other similar allegations in the indictment are sufficient to charge the requisite intent and scienter under *Ernst & Ernst.*

The panel as constituted in this case has voted to deny the petition for rehearing and to reject the suggestion for a rehearing in banc.

The full court has been advised of the suggestion for in banc rehearing, and no judge of the court has requested a vote on the suggestion for rehearing in banc. Fed. R.App.P. 35(b).

The petition for rehearing is denied and the suggestion for a rehearing in banc is rejected.